

FILED

Jun 07 2017, 5:35 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Curtis T. Hill, Jr.
Attorney General of Indiana

Eric P. Babbs
Deputy Attorney General
Indianapolis, Indiana

Stanley M. Levco
Special Prosecuting Attorney
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Stacy R. Uliana
Bargersville, Indiana

James E. Foster
Office of James E. Foster, P.C.
Hammond, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

State of Indiana,

*Appellant-Plaintiff,*

v.

John B. Larkin,

*Appellee-Defendant.*

June 7, 2017

Court of Appeals Case No.
46A04-1607-CR-1522

Appeal from the LaPorte Circuit
Court

The Honorable Patrick B.
Blankenship, Special Judge

Trial Court Cause No.
46C01-1212-FA-610

**Robb, Judge.**

# Case Summary and Issues

[1] Following the death of Stacey Larkin in 2012, the State charged her husband, John, with voluntary manslaughter as a Class A felony. In 2016, Larkin moved for discharge and dismissal, each of which the trial court granted. The State now appeals, raising two issues for our review, which we restate as: 1) whether the trial court erred in granting Larkin's motion for discharge, and 2) whether the trial court erred in granting Larkin's motion to dismiss. Concluding the trial court did not err in granting either motion, we affirm.

# Facts and Procedural History[1]

[2] In June 2012, Larkin contacted Detective Darren Kaplan of the Michigan City Police Department, a family friend, after Stacey sent a strange note to Larkin and left their home with a gun. Detective Kaplan contacted Stacey and requested she return home with the gun, which she did. Detective Kaplan never reported the incident. However, the following month, Detective Kaplan discussed the matter with Long Beach Police Officer Tobin Babcock after Long Beach police officers responded to a domestic situation at the Larkins' home

---

[1] We heard oral argument in this case on April 24, 2017, at the Hammond Academy of Science and Technology. We commend counsel for their advocacy and thank the faculty, staff, and students at the Academy for their participation.

during the same summer. Following the domestic incident, Long Beach Police Officers arrested Stacey.

[3] On December 11, 2012, Larkin called 911 and informed the operator his wife had been shot. Officers from the Long Beach Police Department arrived at Larkin's home and discovered Stacey deceased from two gunshot wounds. Larkin was taken to the police station and placed into an interview room. After being advised of his rights, Larkin immediately requested his attorney be present. Over the course of a couple hours, law enforcement, including Lieutenant Todd Bullis, continued to question Larkin despite Larkin's requests for an attorney. At some point during the interview, Larkin told investigators of the incident occurring the previous summer, including how Detective Kaplan assisted him in getting Stacey home safely. Citing the Fifth Amendment, the trial court later suppressed the statements made during this interview.

[4] On December 13, 2012, Larkin agreed to talk to investigators about the shooting so long as he was charged with voluntary manslaughter in lieu of murder. Larkin, his attorneys, a police investigator, LaPorte County Prosecutor Bob Szilagyi, and Chief Deputy Prosecutor Robert Neary were present during the videotaped interview. During a break, Larkin and his attorneys were left alone in the room and discussed defense strategy. Unbeknownst to them, however, the video recording equipment was not turned off and continued to record. During this time, Larkin explained the events leading to Stacey being shot. According to him, Stacey struggled with mental illness and addiction and he became concerned for Stacey, himself, and their

children when Stacey opened a safe in the home in an attempt to retrieve a gun. A struggle then ensued between Stacey and Larkin, resulting in Stacey suffering two gunshot wounds. The safe's door was later sent to the Federal Bureau of Investigation's office ("FBI") in Quantico, Virginia, for analysis.

[5] At some point during the next week, Lieutenant Bullis reviewed the video of the December 13, 2012, interview and provided a copy to Neary. In January 2013, Neary reviewed the video and then requested court reporter Jamie Arnold transcribe the entire video. In transcribing the video, Arnold observed the conversation with Larkin and his attorneys was recorded and asked Neary whether she should transcribe that portion of the interview. Despite Neary instructing Arnold not to transcribe that portion, the privileged communications were somehow later transcribed and distributed to prosecutors in the LaPorte County Prosecutor's Office. Also in January 2013, Lieutenant Bullis interviewed Stacey's hairdresser and audio recorded the conversation. Following the interview, the audio recording captured a conversation between Lieutenant Bullis and Officer Babcock in which the pair discussed pressing Detective Kaplan for more information regarding the June 2012 incident with Stacey and the possibility of getting Detective Kaplan to change his story to damage any of Larkin's potential defenses.

[6] In December 2013, the State disclosed to Larkin during discovery it captured communications between Larkin and his attorneys by video. In January 2014, the FBI returned the safe's door to the Michigan City Police Department in one piece and in an FBI-sealed bag. On March 18, 2014, the State and Larkin

stipulated the State would have three months, or approximately ninety days, after November 5, 2014, to try its case pursuant to Indiana Criminal Rule 4(C).

[7] In April 2014, Neary checked out the safe's door from the evidence room to send to Larkin's expert, Mark Songer. At the time, the safe's door remained in one piece inside the FBI-sealed bag. When Songer received the safe's door, however, it was broken into three pieces and was no longer housed in the FBI-sealed bag.

[8] In July 2014, Larkin filed a motion to dismiss the voluntary manslaughter charge. Larkin argued that the videotaping of his conversation with his attorney violated his Sixth Amendment right to effective assistance of counsel. On July 31, 2014, Neary and Deputy Prosecuting Attorney Kristina Armstrong filed the State's response to Larkin's motion to dismiss. The State argued that no new subjects were discussed during Larkin's conversation with his attorneys and that no evidence was disclosed or derived as a result of the conversation. Consequently, the State argued that Larkin was not prejudiced by the alleged Sixth Amendment violation. The State attached a transcript of the conversation to its response. At a hearing on Larkin's motion to dismiss, Neary stated that Szilagyi, Armstrong, an intern, and Neary had "all viewed the tape." The trial court ordered the Prosecutor's Office to submit affidavits from any person that viewed the video or read the transcript and detail when they first did so.

Neary submitted an affidavit and stated that he viewed the video of the conversation between Larkin and his attorney at the end of January 2013. Neary stated that "After consulting with prosecutors in the office, I am the only Prosecutor who viewed this portion of the tape with conversation between the Defendant and [his attorney] and/or the transcript of his conversation." The intern also submitted an affidavit and stated that, in August

2014, he read a portion of the transcript of the conversation between Larkin and his counsel. Szilagyi submitted an affidavit and stated that he had "not viewed any portion of the videotape or read any portion of the transcript where a discussion took place between [Larkin] and [his attorney]." Armstrong also submitted an affidavit and denied having "viewed any portion of the videotape or read any portion of the transcript where a discussion took place between [Larkin] and [his attorney]."

In September 2014, Larkin filed a motion to disqualify the LaPorte County Prosecutor's Office from prosecuting the case against him. Larkin pointed out the discrepancy between Armstrong's affidavit and the July 31st filing that she and Neary submitted to the trial court. Larkin requested that a special prosecutor be appointed.

In October 2014, the trial court suppressed the conversation between Larkin and his attorneys, but not the remainder of the interview. The trial court denied Larkin's motion to dismiss, finding no prejudice from the recording of the conversation between Larkin and his attorney. The trial court also denied Larkin's motion to disqualify the LaPorte County Prosecutor's Office . . . .

*Larkin v. State*, 43 N.E.3d 1281, 1283-85 (Ind. Ct. App. 2015) ("*Larkin I*") (some alterations in original) (internal citations and footnote omitted). On October 22, 2014, Larkin moved the trial court to certify the denial of his motion to disqualify the prosecutor's office and for the appointment of a special prosecutor for interlocutory appeal. The trial court granted Larkin's motion and stayed the proceedings, and we thereafter accepted jurisdiction. On appeal, the State argued the issue was moot, contending John Espar was elected as LaPorte County Prosecutor in November 2014 (replacing Szilagyi), Espar was

not involved in the challenged conduct, and therefore a special prosecutor was unnecessary. We agreed the issue was moot and dismissed Larkin's appeal. *Id.* at 1287. However, we recommended the trial court consider disqualifying prosecutors Neary and Armstrong. *Larkin I* was issued on September 30, 2015.

[9] The following week, but prior to the certification of *Larkin I*, the State moved to withdraw the appearances of Neary and Armstrong. In addition, Espar moved for the appointment of a special prosecutor. The trial court promptly granted all three motions and appointed Stanley Levco as special prosecutor. On October 13, 2015, the trial court judge, Michael Bergerson, recused himself and the County Clerk appointed Judge Thomas Alevizos.

[10] *Larkin I* was certified on November 20, 2015, but there is no order in the record showing when the stay on the proceedings was lifted. On November 23, 2015, Larkin moved to disqualify Judge Alevizos alleging the judge had a conflict of interest because he also presided over guardianship matters regarding Larkin's children following his arrest. Judge Alevizos recused himself on December 31, 2015, and after four additional judges either declined or recused themselves from appointment over the next two months, Judge Patrick Blankenship of Pulaski County accepted his appointment as special judge on February 29, 2016.

[11] On March 28, 2016, Larkin moved for discharge pursuant to Rule 4(C), alleging the State's stipulated three-month period to bring him to trial had expired. At a hearing two days later, the trial court ordered the case files be redacted and

provided to Levco. Despite assurances from the LaPorte County Prosecutor's Office that the case file would be redacted and then provided to Levco, the case file was not redacted prior to Levco receiving it. On April 7, 2016, the trial court held a hearing on Larkin's motion for discharge ("April 7 Hearing"). There, the parties discussed the issue of whether the State complied with Rule 4(C) and Larkin orally moved for discharge. On May 11, 2016, Larkin filed a second motion for discharge pursuant to Rule 4(C). On May 20, 2016, Larkin moved to dismiss the charge of voluntary manslaughter, contending he could not receive a fair trial.

[12] On June 9, 2016, the trial court held a hearing at which the State appeared by telephone. The State first argued a previous judge already denied Larkin's motion to dismiss in 2014, and absent new facts, the trial court should adhere to the previous decision. In the alternative, the State also argued for an opportunity to appear in court and present evidence showing Larkin did not suffer prejudice from the way the case had been handled up to that point. On the same day, the trial court issued an order granting both the motion for discharge and motion to dismiss. In discharging Larkin pursuant to Rule 4(C), the trial court stated,

> 1) That the parties agreed on March [18], 2014, that the State of Indiana would have three months (90 days) from November 5, 2014 to try the Defendant herein, within the time limits of Criminal Rule 4.
> 2) That prior to the expiration of the 90 day time limit, the Defense filed a Motion to Certify an Interlocutory Appeal on October 22, 2014.

3) On September 30, 2015, almost one year later, the Court of Appeals issued its opinion.

4) The Court of Appeals opinion was not certified until almost 60 days later on November 20, 2015.

5) On November 23, 2015, the Defendant moved to disqualify Judge Alevizos for cause, because that Judge had presided or was presiding over a probate matter involving the Defendant's minor children.

6) That the appointment of a Special Judge took until February 29, 2016, when this Court accepted jurisdiction.

7) This Court held a Status Hearing on April 7, 2016.

8) At that Status Hearing, the Court was advised by the Defendant's counsel that they would be filing a Criminal Rule 4 Motion.

9) The Defendant subsequently then did file its Criminal Rule 4 Motion, and that motion along with several other motions were argued at the [April 7], 2016 Pretrial.

10) At that [April 7] Pretrial, the Defendant objected to any trial dates as being past the time of the Criminal Rule 4 requirements.

11) The Court did then go ahead after much discussions [sic] between counsels of both the State and the Defendant, set a trial setting in June, and the Defendant wished to make his record that if the Court determined that the Criminal Rule 4 time had not expired, that they could do the trial on June 20, 2016, but that they made the record that they still believed and were arguing Criminal Rule 4 time had spent.

12) That the Court asked the Defense to come up with an ulterior theory of Criminal Rule 4, in the event the Court found that their original position and time line was incorrect, and there was much discussion on that, and the Defendant did.

13) Then at the June 3, 2016 hearing, Criminal Rule 4 was discussed again, and therein the parties discussed if any Court currently has jurisdiction of this case, since the CCS does not show the Appellate Court certification as ever being filed as part of the CCS.

14) The State's position essentially, as I understand, it [sic] is the 90 days could not have begun until the certification. The State

must waive that position in light of the fact that the State's own attorneys, beginning with Deputy Armstrong, Deputy Neary, were filing motions to withdraw and recuse themselves on October 5, 2015 and October 6, 2015. Prosecutor Esbar [sic] recused himself on October 6, 2015, a month and a half before the State argues that a Judge had jurisdiction of that case. They were relying on [this] Court's jurisdiction and authority to grant those withdraws [sic], and so that time has to run to the State.

15) On October 13, 2015, Judge Bergerson recused himself, because Judge Bergerson, I believe, had been in the Prosecutor's Office at the time and had worked some on the Larkin case, so Judge Bergerson did the right thing, and it didn't take him very long to do it. He did it before the case even came back to him, so how does a man who currently doesn't have jurisdiction over the case, if he doesn't, recuse himself from that case before the Appellate Court has even certified, but he did it, and so the Court recognized that it had its own jurisdiction to do that.

16) Judge Alevizos accepted the assignment and set it for a Status Hearing. He accepted the assignment on October 19, 2015, again, one month before the Appellate Court certified their opinion. There would be no need for him to accept jurisdiction of a case that he didn't have jurisdiction over, if the certification was the triggering date that gave him jurisdiction to begin with. But then he goes on, and he sets it for hearing on December 4, 2015. From that point on, both parties act as though the Court in LaPorte County, Judge Alevizos, has jurisdiction.

17) On December 10, 2015, there is a hearing held on a Motion to Recuse, and it is taken under advisement, so the Court, after hearing the Motion of Recusal, still is saying, I am still the Judge with jurisdiction, and I am taking it under advisement, so the clock is still ticking here.

18) In the alternative, if Criminal Rule 4 did not begin until the certification, we still have from November 20, 2015 to December 10, 2015, which is twenty days. And if we don't start up again until this Court's acceptance of jurisdiction on February 29, 2016, Criminal Rule 4 would have expired on May 10, 2016. The only way we would get to May 29, 2016, is that the Court

didn't get jurisdiction until certification, and all time from there forward ran against the Defendant.

19) That puts the Defendant in a position of number one, having to go to trial with a judge who should have recused himself, should have never accepted it, which was Judge Alevizos, who knew he had a problem with that case. Number two, the Defendant is charged with the fact that no judge in LaPorte County wanted to get within a ten foot pole of this case, and to say that the Defendant should bear that, is correct as counsel has stated many times: It should not be a choice between speedy trial and fair trial. He is entitled to both, not one or the other. He is entitled to have both, and as the Court sees it, the only reason this case got to this point was because we had a prosecuting attorney in Mr. Neary and his staff, and we had a law enforcement agency in Long Beach Law Enforcement Agency, that did everything in their power to intentionally violate this Defendant's constitutional rights and civil rights, and make it as difficult as possible for him to obtain a speedy trial.

20) In regards to the State's position that the Defendant waived Criminal Rule 4 at the May 3, 2016 hearing, the Defendant did not waive it, and in fact, the Defendant verified that he had made a proper record that his Criminal Rule 4 Motion would not effect that trial setting in June if the Court determined, in other words, he would not have waived it, if the Court found that the Criminal Rule 4 had not run, and clearly, in any scenario you get to, it had run.

Appellant's Appendix, Volume 4 at 83-86.

[13]     In granting the motion to dismiss, the trial court stated,

> 1) The Defendant is entitled to a Motion to Dismiss because of the Article 1, Section 13, portion of the Indiana Constitution and the 6th Amendment of the United States Constitution. Because of the December 12, 2012 interview of the Defendant, where that recording included conversations between the Defendant and his

attorney, and further, that was compounded by the State intentionally transcribing the twelve minute portion of that interview, even though the court reporter had done the proper thing in not transcribing it, and it was done only at the specific request of the State.

2)  That the State continually violated the 6th Amendment, not just once, by initially recording it, but multiple times.  Every time they made a copy of that conversation is a separate and individual violation.

3)  Every time they disseminated the transcript containing that twelve minute portion was a separate violation of Defendant's 6th Amendment[ rights].

4)  The Court is going to further find that it is not the burden of the Defendant to prove that it caused him harm.  The 6th Amendment violation is a per se violation [sic] Constitutional violation, and since *Taylor* issued by the Supreme Court, it would be the burden of the State to prove beyond a reasonable doubt that that violation has no adverse effect [on] this Defendant.

5)  The Court has discussed with the parties having a *Taylor* hearing.  However, the Court believes that in light of the additional violations committed by Detective Bullis, Detective Babcock, and Detective McClintock, that their testimonies are all tainted and shaded by the fact that it has now become blatantly obvious to this Court that their conduct at that time and since, has demonstrated an animosity against this Defendant that overshadows everything that they do and say.

6)  They conducted three separate surreptitious interviews on December 11 at the Long Beach Police Department after the Defendant had requested an attorney.  After that request, Detective McClintock continued to engage him in conversation, which should have immediately ceased, and then sent in a second officer to conduct administrative tasks that could have been assigned to any jailer, taking finger prints, taking a DNA swab, could have been attended to by any jailer who does that on an everyday basis, but instead, they sent in a second detective, who engaged in similar surreptitious interrogation of Mr. Larkin.

7)  While this was going on, Detective Bullis was recording and

watching the Defendant's conduct and statements. Only then, after watching those two incidences, Detective Bullis took it upon himself to go in and tell the Defendant that his attorney was not available, and he engaged in further conversations with the Defendant.

8) Those tapes were never destroyed. They continue to be viewed and monitored by the investigators and by the State.

9) As a result of those conversations, the State learned about Detective Kaplan from the Michigan City Police Department and his possible knowledge of evidence that may be of assistance to the Defendant in his defense.

10) As a result of learning about him, they subsequently took it upon themselves, Detective Bullis and Detective Babcock, to approach Detective Kaplan and tamper with his testimony in regards to incidences involving this case.

11) In addition, there was a piece of State evidence that was sent to the FBI . . ., a safe, that the FBI conducted its investigation of that piece of evidence and returned it to Prosecutor Neary, who was then supposed to provide it to the Defense to send to their expert to examine the safe. By the time that safe had gotten to the Defense expert, that safe had been tampered with and damaged.

12) That the last known hands that that safe was in was the State. The State was responsible for the chain of custody.

13) While it may be possible for a Court to look at all of these things individually and find that each one may have a very small effect on the outcome of this trial, that is really not the analysis here. No one knows what piece of evidence will have what effect on the outcome of a trial. . . . And so for a Judge to predict at a jury trial whether any of those one single things would have an adverse effect, I have no way of knowing. The Court would have no way of knowing until a jury trial was actually conducted, and then interviewed the jury, and then it is too late.

14) It is the Court's obligation to guarantee a fair trial, and based upon the totality of misconduct on the part of the State, this Court cannot guarantee this Defendant a fair trial.

*Id*. at 86-88.  This appeal ensued.

# Discussion and Decision

## I.  Criminal Rule 4(C)

[14] The State contends the trial court erred in granting Larkin's motion for discharge under Rule 4(C).  Specifically, it claims the period in which it could bring Larkin to trial continued at the very least to the April 7 Hearing, where it claims Larkin waived any objection to a future trial date.  We disagree.

[15] The State bears the burden of bringing the defendant to trial within one year. *Bowman v State*, 884 N.E.2d 917, 919 (Ind. Ct. App. 2008), *trans. denied*.  Rule 4(C) provides a defendant may not be held to answer a criminal charge for greater than one year unless the delay is caused by the defendant, emergency, or court congestion.  *Curtis v. State*, 948 N.E.2d 1143, 1148-49 (Ind. 2011).

> A defendant extends the one-year period by seeking or acquiescing in delay resulting in a later trial date.  A defendant waives his right to be brought to trial within the period by failing to raise a timely objection if, *during the period*, the trial court schedules trial beyond the limit.  However, a defendant has no duty to object to the setting of a belated trial date if the setting occurs after the year has expired.

*Pelley v. State*, 901 N.E.2d 494, 498-99 (Ind. 2009) (emphasis added) (internal citations omitted).

[16]    The standard for reviewing a ruling on a motion for discharge depends on whether the trial court resolved disputed facts or reached legal conclusions based on undisputed facts. *Austin v. State*, 997 N.E.2d 1027, 1039-40 (Ind. 2013). If a trial court resolves disputed facts, those findings are reviewed for clear error. *Id*. at 1040. If a trial court reaches legal conclusions based on undisputed facts, we review those conclusions de novo. *Id*. at 1039.

[17]    Here, the parties stipulated the State would only have three months after November 5, 2014, to try Larkin. The following chart outlines the occurrences and their respective dates relevant to us determining whether this three-month period expired before the April 7 Hearing:

| March 18, 2014 | The State and Larkin stipulate the State will have three months after November 5, 2014, to bring Larkin to trial. |
| October 29, 2014 | The trial court certifies its order denying Larkin's motion to disqualify the prosecutor's office and stays proceedings. Future trial date is vacated. |
| September 30, 2015 | We issue *Larkin I*, affirming the trial court, but recommending Neary and Armstrong recuse themselves from the case. |
| October 2, 2015 | Neary files a motion to withdraw appearance, which the trial court grants on the same day. |
| October 5, 2015 | Armstrong files a motion to withdraw appearance, which is granted by the trial court on the same day. |
| October 6, 2015 | On behalf of the State, Espar moves for appointment of special prosecutor. |

| | |
|---|---|
| October 13, 2015 | Judge Bergerson recuses. |
| October 19, 2015 | Judge Alevizos accepts appointment as special judge and schedules a status hearing for December 4, 2015. |
| November 12, 2015 | Trial court appoints Levco as special prosecutor. |
| November 20, 2015 | *Larkin I* is certified. |
| November 23, 2015 | Larkin moves for change of judge. |
| December 10, 2015 | Hearing on Larkin's motion for change of judge. Matter taken under advisement. |
| December 31, 2015 | Judge Alevizos recuses. |
| January 13, 2016 | County Clerk selects a special judge. |
| January 20, 2016 | Special judge declines appointment. |
| January 21, 2016 | Clerk selects a special judge. |
| January 28, 2016 | Special judge recuses and the Clerk attempts to select a special judge for a third time. |
| February 4, 2016 | Special judge recuses. |
| February 9, 2016 | Clerk selects special judge. |
| February 18, 2016 | Special judge declines appointment. |
| February 29, 2016 | Judge Blankenship accepts appointment. |

| | |
|---|---|
| March 28, 2016 | Larkin moves for discharge pursuant to Rule 4(C), which the trial court takes under advisement. |
| March 30, 2016 | Trial court holds hearing. Larkin orally moves for discharge. The trial court schedules pretrial hearing for April 7, 2016, to discuss potential trial dates. |
| April 6, 2016 | Larkin files timeline in support of discharge. |
| April 7, 2016 | Hearing held. |
| April 11, 2016 | Larkin files brief in support of discharge. |
| May 3, 2016 | Trial court holds hearing. |
| May 11, 2016 | Larkin files a second motion for discharge. |
| June 9, 2016 | Trial court discharges Larkin. |

[18]  There are three periods of delay where the parties dispute whether the delay is attributable to Larkin, court congestion, or emergency: the period for the interlocutory appeal, and if charged to Larkin, what date the delay was no longer attributable to him; the period between the trial court taking Larkin's motion for change of judge under advisement and Judge Alevizos' recusal; and the period between Judge Alevizos' recusal and the appointment of Judge Blankenship. We address each in turn.

# A. Interlocutory Appeal Delay

### 1. *Attribution of Delay*

[19]    A week prior to November 5, 2014, the date the State's three-month period was supposed to begin running, the trial court certified its order denying Larkin's motion to disqualify the LaPorte County Prosecutor's Office for interlocutory appeal and stayed the proceedings. The parties dispute whether the subsequent delay was caused by Larkin. The State argues an interlocutory appeal, regardless of whether it is brought on behalf of the State or the defendant, tolls the Rule 4(C) period. Larkin counters the period should be charged against the Rule 4(C) period because he would not have sought an interlocutory appeal but-for police and prosecutorial misconduct. Both arguments hold merit.

[20]    The State cites to *Pelley* where our supreme court was tasked with determining whether a delay resulting from the State's interlocutory appeal was chargeable against the Rule 4(C) period.[2] 901 N.E.2d at 494. The court first acknowledged Rule 4(C) only provides exceptions for acts caused by the defendant, emergency, or court congestion, and clearly an interlocutory appeal brought on

---

[2] Much of Indiana's caselaw on Rule 4(C) properly phrases issues as whether delays can be attributed to acts caused by the defendant, court congestion, or emergency. However, many of these same cases also address the issue of whether the delay can be charged to the State. *E.g.*, *Harrington v. State*, 588 N.E.2d 509, 510 (Ind. Ct. App. 1992). This phrasing makes some sense given the fact the State maintains the burden of timely trying a case against a defendant pursuant to Rule 4(C). However, we also note Rule 4(C) makes no reference to determining whether the State caused a delay, and as such, we think such phrasing appears to punish the State. The rule makes clear any delay not caused by the defendant, court congestion, or emergency is charged to the Rule 4(C) period, not the State. Therefore, we address any delay not caused by the acts of the defendant, court congestion, emergency, or any other common-law exception, *see Pelley*, 901 N.E.2d at 499-500, as delays chargeable to the Rule 4(C) period.

behalf of the State did not fall under any of these exceptions. Despite the fact the defendant did not cause the delay, the court concluded the delay could not be charged against the Rule 4(C) period, reasoning,

> When trial court proceedings have been stayed pending resolution of the State's interlocutory appeal, the trial court loses jurisdiction to try the defendant and has no ability to speed the appellate process. As a practical matter, applying the Criminal Rule 4(C) one-year requirement to interlocutory appeals would render an appeal by the State impossible because it would in all likelihood trigger a mandatory discharge of the defendant.

*Id*. at 499. The court further clarified in a general sense "that the time for interlocutory appeal is excluded from Rule 4(C)'s limitation only when the trial court proceedings have been stayed." *Id*. at 500. Therefore, because the delay occasioned by the State's interlocutory appeal was not caused by the defendant's act, court congestion, or emergency, *Pelley* created at least a limited common-law exception to Rule 4(C): when trial court proceedings are stayed following certification of an interlocutory order, the subsequent delay cannot be charged to the Rule 4(C) period. Here, the trial court, at Larkin's request, certified its order denying Larkin's motion to disqualify the prosecutor's office and stayed the proceedings pending appeal.

[21] Larkin counters by citing to *Harrington v. State*, 588 N.E.2d 509 (Ind. Ct. App. 1992). There, the parties disputed whether a 317-day delay, which commenced with the defendant moving for the appointment of a special prosecutor and a subsequent motion for a continuance, was caused by the defendant and

chargeable to him. The State argued this period was chargeable to the defendant because the delay was caused by the defendant's acts. The defendant blamed the delay on the State, claiming a special prosecutor was necessary because the prosecutor had previously served as his counsel in a criminal matter.

[22] At the outset, we noted,

> Any delay resulting from a prosecutor's conflict, even if the delay technically results from a defendant's motion to continue, is chargeable to the State. In *Biggs v. State*[, 546 N.E.2d 1271, 1274 (Ind. Ct. App. 1989),] we acknowledged, in general, "a defendant is chargeable with delay occasioned by his own request for a continuance." However, a defendant cannot be charged with the delay if the defendant made his motion because the State failed to comply with a discovery request. *See id*. at 1275. We offered the following explanation for this exception to the general rule: "[Putting] defendants in a position whereby they must either go to trial unprepared due to the State's failure to respond to discovery requests or waive their rights to a speedy trial, is to put the defendants in an untenable situation." *Id*.

*Harrington*, 588 N.E.2d at 511 (some alteration in original). Relying on the rationale provided in *Biggs*, we concluded the delay *was* chargeable to the Rule 4(C) period, reasoning,

> Just as a defendant should not have to choose between a speedy trial and a fair trial as a result of the State's failing to comply with a discovery order, a defendant should not be forced to choose between a speedy trial and a fair trial as a result of the prosecutor's failure to identify and cure his conflicts.

*Id*. Therefore, *Harrington* appears to create a limited common-law exception to acts caused by a defendant when the acts are necessary for a fair trial as a result of a prosecutor's conflict. Here, prosecutors in the LaPorte County Prosecutor's Office clearly had a conflict at the time Larkin moved to disqualify the office from the case.

[23] As demonstrated above, *Pelley* and *Harrington* strongly support each parties' contentions and both cases are persuasive to an extent. On one hand, the State is correct the certification of an interlocutory order and stay of proceedings deprives a trial court of jurisdiction, and *Pelley* makes clear the delay cannot be charged against the Rule 4(C) period. On the other hand, however, prosecutors in the LaPorte County Prosecutor's Office had a conflict they failed to timely identify and cure and *Harrington* appears to dictate any subsequent delay from a prosecutor's conflict is chargeable to the Rule 4(C) period.

[24] Ultimately, we find the rationale and underlying policy considerations provided in *Pelley* are controlling. The fact the proceedings were stayed at the request of Larkin removes from the State *and* Larkin *and* the trial court the opportunity to proceed with the case. Stated differently, following *Harrington* would make it *impossible* for the State to timely bring Larkin to trial. Sensibly, one could counter this point by noting it is the State's burden to bring a defendant to trial, and if we were to follow *Harrington* in this case, it would send a clear message to prosecutor's offices they must identify and cure conflicts or risk losing their opportunities to try cases. However, following *Harrington* in this case would have additional consequences. We first note there is no ability to predict the

amount of time an appeal may take and neither the trial court nor parties to a case have control over that delay. Here, it was nearly a year from the time the trial court certified its order for interlocutory appeal until *Larkin I* was issued and if we charged delays from interlocutory appeals to the Rule 4(C) period, defendants could often successfully seek discharge regardless of the merit of their interlocutory claim.[3] This, in turn, would influence the exercise of a trial court's discretion to certify interlocutory orders for appeal and would likely deprive defendants of the opportunity for an immediate appeal of an adverse ruling. We conclude *Pelley* is controlling of the issue regarding Larkin's interlocutory appeal and therefore the delay is chargeable to Larkin.

## 2. Extent of Delay

The parties next dispute the length of the delay. Specifically, the parties agree the tolling commenced on November 5, 2014, but disagree as to when the Rule 4(C) period resumed running. In determining the extent of a delay caused by a defendant, we proceed on a case-by-case basis. *Curtis*, 948 N.E.2d at 1150.

The State argues the delay ended on November 20, 2015, the date *Larkin I* was certified. In support, the State cites to Indiana Appellate Rule 65(E), which provides, "The trial court, Administrative Agency, and parties shall not take any action in reliance upon the opinion or memorandum decision until the

---

[3] In such a case, it would likely be necessary for courts to then determine whether the claim of conflict was meritorious, and as our case law makes clear, the application of Rule 4(C) is not dependent on whether "the act causing the delay was justifiable or meritorious." *State v. Grow*, 255 Ind. 183, 185, 263 N.E.2d 277, 278 (1970).

opinion or memorandum decision is certified." *See also Rogers Grp., Inc. v. Diamond Builders, LLC*, 833 N.E.2d 475, 477 (Ind. Ct. App. 2005) ("[T]he Clerk's certification of appellate decisions signals the parties that such a decision is 'final.'").

[27] Larkin acknowledges the date of certification would typically be the earliest date the trial court should reassume jurisdiction and lift the stay of proceedings. However, he counters this is not a typical case and cites to numerous actions by the State and the trial court occurring shortly after we issued *Larkin I*, but before it was certified; actions he believes indicate the trial court reassumed jurisdiction and the State submitted itself to the trial court's jurisdiction. In addition, he also cites to actions by the State prior to certification that essentially conceded any issues the parties could raise on rehearing or transfer. Therefore, Larkin claims the clock began running at some point in early October 2015. We agree with Larkin.

[28] In *Larkin I*, Larkin appealed the denial of his motion to disqualify the prosecutor's office and for the appointment of a special prosecutor. On September 30, 2015, we dismissed Larkin's appeal after determining the issue was moot because while the case was pending on appeal, Espar was elected as the new county prosecutor, replacing Szilagyi. Thereafter, the following events occurred in the trial court and *prior* to the certification of *Larkin I* on November 20, 2015:

| | |
|---|---|
| October 2, 2015 | Neary files a motion to withdraw appearance, which the trial court grants on the same day. |
| October 5, 2015 | Armstrong files a motion to withdraw appearance, which is granted by the trial court on the same day. |
| October 6, 2015 | On behalf of the State, Espar moves for appointment of special prosecutor. |
| October 13, 2015 | Judge Bergerson recuses. |
| October 19, 2015 | Judge Alevizos accepts appointment as special judge and schedules a status hearing for December 4, 2015. |
| November 12, 2015 | Trial court appoints Levco as special prosecutor. |

[29]     In light of these events, it is clear the State immediately submitted itself to the trial court and the trial court immediately acted under the impression it had jurisdiction.  Although there is no date in the record indicating when the stay of proceedings was explicitly lifted, it is clear the State's and the trial court's acts amount to a constructive lift of the stay.  And more importantly, the State, not Larkin, moved for the appointment of a special prosecutor on October 6, 2015, approximately six weeks prior to certification.  This act, in effect, resolved any issues Larkin may have raised on rehearing or transfer and satisfied the purpose of finality underlying Appellate Rule 65(E).  Thus, by October 6, 2015, the State submitted itself to the trial court, the trial court acted as if it had jurisdiction, and the State moved to appoint a special prosecutor thereby resolving any further appellate issues.  We conclude this delay ended on October 6, 2015, and thereafter the time began running against the Rule 4(C) period.

[30] The dissent disagrees with this conclusion on three bases. First, it believes the actions by the State and the trial court in early October are voidable and susceptible to ratification. The dissent therefore believes Larkin essentially ratified these actions by failing to object. However, in an October 14, 2015, motion, Larkin explained to the trial court the State's motions were premature and any action by the trial court addressing the merits of the State's motions would also be premature. Although the motion does not specifically mention the word "objection," it is clear Larkin was objecting to the State's and the trial court's actions.

[31] Second, the dissent believes the delay could not have ended on October 6, 2015, because in the same October 14 motion noted above, Larkin explained he was contemplating filing a petition for transfer. However, the issues raised in *Larkin I* only addressed the denial of Larkin's motion to disqualify the LaPorte County Prosecutor's Office and to appoint a special prosecutor. Larkin's motion to disqualify the prosecutor's office was moot because in the interim a new prosecuting attorney had been elected. Therefore, this would not be an issue to raise on transfer. The only issue potentially available to Larkin on transfer would have been the denial of his motion to appoint a special prosecutor. But on October 6, 2015, the State removed all likelihood Larkin would seek transfer on this issue because it—not Larkin—moved to appoint a special prosecutor. Our review of the record indicates the State's and the trial court's actions satisfied Appellate Rule 65(E).

[32] Third, the dissent asserts our conclusion that the delay ended on October 6, 2015, appears to "improperly penalize the State" when in fact the State's act of moving for a special prosecutor benefitted Larkin because such an act "expedited the progress of the case once [*Larkin I*] was certified." Slip op. at ¶ 54. We disagree. As noted Rule 4(C) is not written to help or punish the State. The rule only addresses whether a delay stops the Rule 4(C) time from running. In addition, the rule plainly provides *the State maintains the burden* of bringing a defendant to trial to ensure timeliness. *See supra* note 2. Therefore, the dissent's assertion that our decision *penalizes* the State is not in accord with the plain language of Rule 4(C). *See id*. As to the dissent's assertion the State's actions expedited the case thereby benefitting Larkin, we reemphasize the inquiry is not whether the State was harmed or the defendant incurred a benefit, but rather is when the Rule 4(C) time stopped.

[33] In sum, the State proceeded after *Larkin I* was issued as if under the impression the clock was running against the Rule 4(C) period and the act of filing the motions early limited the impact on the period. The State cannot have its cake and eat it too in now claiming this time should be chargeable to Larkin. Based solely on the unique set of facts and circumstances in this case, we conclude the period for the interlocutory appeal was charged against Larkin between November 5, 2014, and October 6, 2015, and for the next sixty-five days (until the change of judge hearing) the clock ran against the Rule 4(C) period. Therefore, even assuming the other periods of delay in dispute are chargeable to Larkin, the Rule 4(C) period expired on March 26, 2016, two days before

Larkin moved for discharge. For this reason, we need not address whether Larkin waived his claim at the April 7 Hearing because the Rule 4(C) time period had already run by that date. The trial court did not err in concluding Larkin was entitled to discharge pursuant to Rule 4(C). This conclusion is sufficient to affirm the trial court. However, we opt to delve further into Rule 4(C) analysis given the complicated nature of this appeal. We therefore proceed under the assumption the State is correct the interlocutory appeal tolled the Rule 4(C) period until certification on November 20, 2015.

## B. Motion for Change of Judge Delay

[34] The parties do not dispute the period between November 20, 2015, and December 10, 2015, or twenty days, ran against the Rule 4(C) period thereby bringing the State's remaining period to try Larkin to approximately seventy days.[4] The parties do dispute, however, whether the period beginning with the hearing on Larkin's motion for change of judge on December 10, 2015, and Judge Alevizos' recusal on December 31, 2015, is chargeable to Larkin. The

---

[4] The dissent does not agree this issue is undisputed and cites to both the Appellant's Brief and the Reply Brief of the Appellant where the State appears to assert the delay resulting from Larkin's motion for change of judge began on November 23, 2015, the date he filed the motion. We acknowledge Larkin filed his motion on this date and further note the caselaw cited by the dissent supports the notion the delay should be charged from the date the defendant files its motion for change of judge. However, because of the unique facts of this case, we cannot agree. The trial court found the delay did not begin until December 10, 2015, the day the trial court held a hearing on the motion and took the matter under advisement. In its briefs, the State does not specifically challenge this finding, nor does the State cite to any circumstances in the record showing the filing of the motion caused any delay prior to the trial court taking the matter under advisement on December 10, 2015. Yet, even assuming the delay began on November 23, 2015, the discussion below reveals the delay is chargeable to the Rule 4(C) period and therefore the State still failed to meet the Rule 4(C) deadline.

State argues it was Larkin's act of moving for change of judge that caused the delay. Similar to his argument above, Larkin counters *Harrington* should control and dictates any delay from his motion for change of judge be charged to the Rule 4(C) period because Larkin should not be placed in a position of choosing between a fair or timely trial. We agree with Larkin.

[35] Below, the trial court found Judge Alevizos never should have accepted appointment as special judge and at the very least should have immediately recused himself due to a conflict. Although the trial court did not note details of the conflict in its findings, the record is revealing. Following Stacey's death and Larkin's arrest, Larkin's sister, Dorothy Denise Carroll, a licensed attorney in Illinois, was granted legal and physical custody of Larkin's children and acted as guardian of the children's estates and trustee of their trusts. At some point, Carroll sought approval from Judge Alevizos, the presiding judge over the familial matters, to purchase Larkin's home with money from the children's trusts for the purpose of allowing the children to continue to live in the home. We previously summarized the relevant portions of a hearing on Carroll's petition:

> Carroll presented the testimony of Toni Henke-Wheeler ("Henke-Wheeler"), who provided family and individual counseling to the Children. Henke-Wheeler testified that the Children were dealing with grief stemming from the death of their mother, their father's alleged role in the death of their mother, and the perceived "loss" of their mother during the latter part of her life due to her substance abuse problems. When Henke-Wheeler referred to the "alleged" role Larkin played in

the death of the Children's mother, the trial court interrupted her and stated:

["]So is the—*the involvement isn't alleged*. The nature of the involvement is what's at issue. Is that my understanding of the criminal case? So you don't need to [use] alleged there.["]

Henke-Wheeler was then cross-examined by Larkin's counsel, who asked the question, "Given the fact that the children now only have one parent, their father, in your opinion, if he is removed from their presence, what impact would his absence have on the children?" Before Henke-Wheeler could respond, the trial court objected *sua sponte,* stating "It's irrelevant. You don't have to object. It's irrelevant."

*In re Guardianship of K.K.L.*, No. 46A04-1507-GU-921, slip op. ¶ 10 (Ind. Ct. App. Apr. 26, 2016) (alterations in original) (emphasis added) (citations omitted). Judge Alevizos then denied Carroll's petition. Carroll did not appeal this order.

[36]     A week later, the trial court *sua sponte* ordered Carroll to appear and show cause as to why she should not be removed as the guardian of the Children's estates.

The trial court cited the following reasons for its order:

1. It appears from the Chronological Case Summary that [Carroll] has not filed an accounting;

2. [Carroll] caused to be filed a petition to have the wards' trust purchase her brother, John Larkin's, house. The Court finds this as evidence that she was more interested in her brother's fiduciary interest than the fiduciary interests of the wards.

3. More importantly, [Carroll] did not, in her capacity as personal representative/Guardian, file a lawsuit against (her brother) John Larkin, who is the individual charged with the homicide of the wards' mother (and the Estate's decedent). It appears that the statute of limitations has now passed for her to attempt to bring suit at this time.

*Id.* at ¶ 12 (alterations in original) (citation omitted). Following the show cause hearing, Judge Alevizos entered an order removing Carroll as guardian of the children's estates and trustee of the children's trusts. On appeal, we reversed the trial court's order in its entirety. *Id.* at ¶ 30. Judge Alevizos also later reported Carroll to an Illinois Disciplinary Commission alleging Carroll made false misrepresentations, but the record is unclear as to the circumstances surrounding Judge Alevizos' allegations. *See* Transcript, Volume II at 5.

[37] As noted above, the general rule is acts by a defendant causing delay are charged to him, and here, Larkin moved for change of judge and a delay followed as the trial court took the matter under advisement. Alternatively, *Harrington* dictates a "defendant should not be forced to choose between a speedy trial and a fair trial as a result of the prosecutor's failure to identify and cure his conflicts." *Harrington*, 588 N.E.2d at 511. The difference between this case and *Harrington* is this case also addresses a judicial conflict. Despite this factual difference, we find the reasoning in *Harrington* persuasive. To be clear, Rule 4(C) only provides exceptions to the State's burden of bringing a defendant to trial in a timely manner. Those exceptions merely speak to acts by a defendant, emergency, or court congestion, and the rule does not include any

language pertaining to prosecutorial or judicial conflicts of interest; *Harrington* recognizes an exception for prosecutorial conflicts, and this case recognizes an exception for judicial conflicts.[5] Just as a prosecutor has a duty to identify and cure conflicts, Canon 2.11 of the Indiana Code of Judicial Conduct provides in relevant part, "A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned . . . ." And in light of the record before us, an objective person could have reasonably questioned Judge Alevizos' impartiality. Therefore, like the defendant in *Harrington*, Larkin was placed in an untenable situation. Larkin was forced to choose between a timely trial and a trial presided over by a judge with a taint of prejudice and bias. Our federal and state constitutions demand defendants receive timely trials by impartial judges. As noted above, we merely address this delay *arguendo*, but we conclude the delay of twenty-one days between December 10, 2015, to December 31, 2015, is chargeable to the Rule 4(C) period, not Larkin, leaving the State forty-nine days in the Rule 4(C) period to bring Larkin to trial.

---

[5] We acknowledge the decision to follow *Harrington* may appear at first blush to be contradictory since we opted not to follow *Harrington* when addressing the interlocutory delay. To be clear, the delay from the interlocutory appeal completely deprived the trial court of jurisdiction and therefore *Pelley* controlled. Here, there was no stay of proceedings; rather, the delay resulted from a conflict through no fault of Larkin and therefore *Harrington* is controlling as to the present issue.

# C. Appointment of Special Judge Delay

[38] The parties next dispute the fifty-nine day delay from December 31, 2015, to February 29, 2016, in appointing a special judge. In light of our conclusion the delay resulting from Larkin's motion for change of judge is chargeable to the Rule 4(C) period, the State contends this fifty-nine-delay is not chargeable to the Rule 4(C) period because the delay falls under the court congestion exception. Specifically, it cites to *Henderson v. State*, 647 N.E.2d 7 (Ind. Ct. App. 1995), *trans. denied*, where we held a "delay due to the unavailability of a judge who can properly hear a case is an exigent circumstance which qualifies as court congestion and tolls the running the Crim.R. 4(C) time period." *Id.* at 13 (relying on our supreme court's decision in *Morrison v. State*, 555 N.E.2d 458 (Ind. 1990)). Larkin believes this delay should be charged to the Rule 4(C) period because the delay "was caused by circumstances beyond Larkin's control, i.e., the trial court's erroneous procedure for selecting a new judge and the conflicts created by the State's misconduct, not Larkin." Appellee's Brief at 34. Larkin cites to *Young v. State*, 521 N.E.2d 671, 673 (Ind. 1988), where our supreme court was tasked with attributing delay occasioned by the defendant's counsel's resignation from the public defender's office and concluded the defendant could not be charged with the delay because he did not cause his attorney's resignation. Given the facts of this case, we agree with Larkin.

[39] At the December 10 hearing on Larkin's motion for change of judge, Judge Alevizos warned the parties every remaining LaPorte County judge had a conflict of interest and would not be able to preside over the case if he recused.

He further explained this would require the County Clerk to seek a senior judge or a judge from another county. Judge Alevizos' statements were consistent with LaPorte County's Local Rule 46-CR 2.2, which provides if no LaPorte County judge is able to hear a case, the County Clerk shall select a judge from contiguous counties. However, Rule 46-CR 2.2 further provides,

> In cases in which no full-time judicial officer is eligible to serve as special judge, *or* the particular circumstances of a case warrants selection of a special judge by the Indiana Supreme Court, the regular sitting judge under Criminal Rule 13(D) may certify the case to the Supreme Court for appointment of a special judge.

(Emphasis added.) In his December 31 Order granting Larkin's motion for change of judge, Judge Alevizos directed the County Clerk to "select a successor judge pursuant to Local Rules." Appellant's App., Vol. 2 at 89. The County Clerk then, through no fault of his or her own, proceeded to select five different judges over a two-month period.

[40] Upon review of this unique record, Judge Alevizos should have certified this case for the appointment of a special judge. Even as Judge Alevizos wrote in the December 31 order,

> [T]his is a matter full of circumstances to be known for which a reasonable person, competent enough to appreciate all the above, would be hard to find; in fact, it is quite likely that only those with authority to review the decision of this court today would be so competent. Therefore, *to save this matter any further delays and to ensure that any sense of bias is removed from this overly complicated set of circumstances*, the Court will GRANT the motion for recusal.

*Id.* at 88 (emphasis added). Thus, even Judge Alevizos recognized in his own words, albeit implicitly, the particular circumstances in this case warranted special treatment. In addition, he based his ruling in part on his desire to save the matter from further delay; however, this did not occur. The appropriate action would have been to certify the case to our supreme court to appoint a special judge, and although we may only speculate, we have little doubt the supreme court would have promptly selected a special judge given the nature of this case. Judge Alevizos, however, selected a more inefficient route, a route he knew or should have known would cause an abnormal delay. We conclude the particular circumstances of this case do not warrant a finding that the fifty-nine-day delay falls under the court congestion exception. Again, we merely address this delay *arguendo*, but we conclude the delay of fifty-nine days between December 31, 2015, and February 29, 2016, is chargeable to the Rule 4(C) period, not Larkin, leaving the State with no more time.

[41] In sum, the crux of the State's contention is the Rule 4(C) period had not yet expired by the April 7 Hearing. The delay from the interlocutory appeal is chargeable to Larkin, but the time began running against the Rule 4(C) period again on October 6, 2015, leaving the State with ninety days. Although we conclude to the contrary, even assuming the following delays were chargeable to Larkin, the Rule 4(C) period expired March 26, 2016. On the other hand, if by chance the Rule 4(C) period did not begin to run until November 20, 2015, the Rule 4(C) period expired in the middle of February as we already concluded

the latter delays are charged to the Rule 4(C) period.  The trial court properly

discharged Larkin.

# II.  Motion to Dismiss[6]

## A.  Standard of Review

We review a trial court's ruling on a motion to dismiss a charging
information for an abuse of discretion.  An abuse of discretion
occurs when the trial court's decision is clearly against the logic
and effect of the facts and circumstances before it.  A trial court
also abuses its discretion when it misinterprets the law.

*An-Hung Yao v. State*, 975 N.E.2d 1273, 1276 (Ind. 2012) (citations and internal

quotation marks omitted).

## B.  Fair Trial

The State contends the trial court abused its discretion in dismissing the charge

against Larkin on the basis Larkin could not receive a fair trial.  Specifically, it

acknowledges a presumption of prejudice attached due to the eavesdropping,

but claims the trial court erred in not holding a hearing at which the State could

present evidence to rebut the presumption pursuant to *State v. Taylor*, 49 N.E.3d

1019 (Ind. 2016).  Larkin asserts *Taylor* is not controlling because the

---

[6] We note this case is resolved by the outcome of the discharge issue, but we opt to address the State's
misconduct as well.

misconduct in this case is far greater and more akin to *State v. Schmitt*, 915 N.E.2d 520, 521 (Ind. Ct. App. 2009), *trans. denied.* We agree with Larkin.

[44] In *Taylor*, police officers and prosecutors eavesdropped on a conversation between a defendant and his attorney and the police officers pleaded the Fifth Amendment when questioned about the eavesdropping. The issue for our supreme court was whether blanket suppression of the police officers' testimony was the proper remedy to cure the constitutional violation. The court first explained in such circumstances there is a presumption of prejudice, but this presumption is rebuttable. 49 N.E.3d at 1024. Because the officers learned of both tangible (location of evidence) and intangible (defense strategy) evidence while eavesdropping, the court noted as follows:

> The eavesdropping here gives the State two unfair advantages. One is learning the whereabouts of *evidence* it would not otherwise discover, like the handgun. The trial court here addressed that prejudice by applying the exclusionary rule, under which unconstitutionally seized evidence "is generally not admissible in a prosecution . . . absent evidence of a recognized exception" to the rule. One such exception is the "ultimate discovery exception," which applies when the State can show "by a preponderance of the evidence" that it had an independent source for discovering the evidence. Here the court applied that exception to the other various exhibits and neither party challenges the court's "independent source" findings.
>
> The State's second unfair advantage, however—learning *defense strategy*—is more insidious and therefore warrants a unique and more stringent remedy. Having stolen Taylor's strategic "playbook," tainted witnesses can preemptively shade their testimony to undermine that strategy. Shading testimony based

on ill-gotten strategic insight is more difficult to detect, but just as damaging to the fairness of an adversarial proceeding. Unfortunately, the extent to which the State actually prejudiced Taylor by capitalizing on both these advantages is, in the State's words, "shrouded in a fog of uncertainty," especially considering the officers' refusal to reveal what was overheard and by whom.

*Id*. at 1027-28 (alteration and emphasis in original) (citations omitted). Therefore, in addressing the fact the State learned the defendant's defense strategy, the court held the State should bear the burden of disproving prejudice from testimonial, or intangible, evidence stemming from that misconduct beyond a reasonable doubt. *Id*. at 1028. In addition, the State must be given a full opportunity to meet that burden. *Id*. Therefore, the State here claims the trial court erred in not giving it a full opportunity to meet its burden of disproving prejudice to Larkin.

[45] Comparatively, Larkin cites to *Schmitt*. There, the State appealed the trial court's decision to sanction the State by dismissing charges against the defendant because the State failed to comply with a discovery order. On appeal, the State argued dismissal of the charges was not the proper remedy. We noted,

> A trial judge has the responsibility to direct the trial in a manner that facilitates the ascertainment of truth, ensures fairness, and obtains economy of time and effort commensurate with the rights of society and the criminal defendant. Where there has been a failure to comply with discovery procedures, the trial judge is usually in the best position to determine the dictates of fundamental fairness and whether any resulting harm can be eliminated or satisfactorily alleviated. . . . The trial court must be

given wide discretionary latitude in discovery matters since it has the duty to promote the discovery of truth and to guide and control the proceedings, and will be granted deference in assessing what constitutes substantial compliance with discovery orders.

* * *

Where the State's actions were deliberate and the conduct prevented a fair trial, a more extreme remedial measure, such as the exclusion of evidence, may be employed. Dismissal of charges is also a sanction within the arsenal of the trial judge in dealing with the failure of the prosecution to afford the defense access to evidentiary materials as ordered. In determining whether dismissal was proper, the court should consider whether the breach was intentional or in bad faith and whether substantial prejudice resulted.

915 N.E.2d at 522-23 (alteration in original) (citations omitted).

[46]    At the outset, we emphasize the misconduct identified in *Taylor* was eavesdropping, and only eavesdropping, and our supreme court was tasked with establishing a limited framework to allow the State the opportunity to disprove taint from eavesdropping. Here, and in stark contrast: 1) law enforcement initially deprived Larkin of the opportunity to speak to his attorney, 2) Neary and law enforcement recorded Larkin's privileged communications with his attorney, 3) after learning the communications had been recorded, Neary had the recording transcribed and disseminated, 4) Neary and Armstrong made conflicting statements about who had seen the video and/or transcript of the video, 5) the safe's door was tampered with prior to Larkin having an opportunity to examine it, 6) Detective Babcock expressed an intent to force Detective Kaplan to change his story regarding Stacey's alleged

suicidal episode in the summer of 2014, and 7) a non-redacted case file was provided to newly appointed Special Prosecutor Levco despite the trial court ordering Special Prosecutor Levco only receive a redacted case file. Clearly, the misconduct here far exceeds that found in *Taylor*, and given this disparity, *Taylor* cannot control. Even assuming *Taylor* is controlling, the State's argument still fails. As the State acknowledges, "On June 9, 2016, the trial court held a hearing at which the State appeared by telephone." Brief of Appellant at 20. During the hearing, the parties discussed Larkin's motion to dismiss. At one point, the State noted its desire to have the court hold an additional hearing so it could present evidence to disprove prejudice. However, we express two concerns relevant to this issue. First, at oral argument, Levco suggested he had not viewed the recording of the privileged communications, but in the same breath argued a *Taylor* hearing was necessary because he did not believe there was prejudicial information contained on the recording that was not already known from other sources. In light of these comments, it is apparent Levco, one way or another, learned of the information because there is no other way he could confidently make these statements. Therefore, the fact Levco had knowledge of the contents of the communications is even more prejudicial to Larkin as it extends the taint of the State's misconduct to the man tasked with prosecuting Larkin in a tribunal *free* of taint. Second, our review of the record shows the State made no offer to prove after the trial court declined the State's request to hold a *Taylor* hearing. "An offer to prove is the method by which counsel places before the trial court (and ultimately the reviewing court) the evidence he or she wishes to present, to allow the court to determine the

relevancy and admissibility of the proposed testimony." *Arhelger v. State*, 714 N.E.2d 659, 664 (Ind. Ct. App. 1999). We think under the circumstances of this case, the State was required to make an offer to prove regarding the additional evidence it wished to present. Because the State did not make an offer to prove, we have not been provided an adequate record to determine whether the State suffered prejudice even if the trial court erred in not holding a *Taylor* hearing.

[47] We further acknowledge *Schmitt* is also not directly on point as it only addressed sanctions for deliberate violations of discovery orders. Despite this, we find its language persuasive and relevant to the question at hand. Here, the trial court was in the best position to ensure a fair trial, and as it clearly stated in its order granting Larkin's motion to dismiss, "It is the Court's obligation to guarantee a fair trial, and based upon the totality of misconduct on the part of the State, this Court cannot guarantee this Defendant a fair trial." Appellant's App., Vol. 4 at 88. And although the trial court did not enter specific findings as to whether the misconduct was done deliberately or in bad faith or whether substantial prejudice resulted, it is clear to us the several acts of misconduct were done, at the very least, in bad faith, and such acts severely prejudiced Larkin to the extent he could not receive a fair trial. The State's actions here threaten the public trust in our criminal justice system. This cannot and will not be tolerated. We conclude the trial court did not abuse its discretion in granting Larkin's motion to dismiss.

# Conclusion

[48] The trial court did not err in granting Larkin's motion for discharge and motion to dismiss. Accordingly, we affirm the trial court's judgment.

[49] Affirmed.

Riley, J., concurs.

Barnes, J., dissents with opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

State of Indiana,

*Appellant-Plaintiff,*

v.

John B. Larkin,

*Appellee-Defendant.*

Court of Appeals Case No.
46A04-1607-CR-1522

**Barnes, Judge, dissenting.**

[50] I respectfully dissent. I am well aware of the highly-questionable conduct engaged in by members of the LaPorte County Prosecutor's Office and law enforcement community on more than one occasion, having authored this court's opinions in both *Larkin I* and *Taylor*. However, I cannot conclude that Larkin's speedy trial rights under Criminal Rule 4(C) were violated, nor that the trial court properly granted his motion to dismiss on constitutional grounds.

## I. Criminal Rule 4(C)

[51] I differ from the majority regarding its attribution of several periods of time to the Rule 4(C) clock rather than to Larkin. First, while I fully agree with the majority's analysis that the time in which the interlocutory appeal for *Larkin I* was pending was attributable to Larkin, I conclude that time did not expire until the clerk of this court certified our decision as final on November 20, 2015.

Indiana Appellate Rule 65(E) states in part:

> The Clerk shall certify the opinion or memorandum decision to the trial court or Administrative Agency only after the time for all Petitions for Rehearing, Transfer, or Review has expired, unless all the parties request earlier certification. If the Supreme Court grants transfer or review, the Clerk shall not certify any opinion or memorandum decision until final disposition by the Supreme Court. The trial court, Administrative Agency, and parties shall not take any action in reliance upon the opinion or memorandum decision until the opinion or memorandum decision is certified.

It has been said that trial courts lack "jurisdiction" to perform any action in a case while an appeal of a final judgment is pending, except for ministerial tasks such as reassessing costs, correcting the record, or enforcing a judgment. *In re Paternity of V.A.*, 10 N.E.3d 65, 67-68 n.1 (Ind. Ct. App. 2014). *See also Pflederer v. Kesslerwood Lake Ass'n, Inc.*, 878 N.E.2d 510, 514 (Ind. Ct. App. 2007) (holding that issue of costs and fees to be imposed based on wrongful issuance of injunction was not ripe until appellate decision was certified as final); *Hancock v. State*, 786 N.E.2d 1142, 1143, n.1 (Ind. Ct. App. 2003) (holding trial court's action in resentencing defendant following remand on appeal before appellate decision was certified as final "was premature and should be considered as a nullity").

I concede that our supreme court in recent years has narrowed the definition of appellate "jurisdiction." *See, e.g.*, *In re D.J. v. Indiana Dep't of Corr.*, 68 N.E.3d 574, 579 (Ind. 2017); *In re Adoption of O.R.*, 16 N.E.3d 965, 970 (Ind. 2014). It is

possible that a trial court's actions while an appeal is pending may not raise a "jurisdictional" problem and such actions may not be "void." *See K.S. v. State*, 849 N.E.2d 538, 541 (Ind. 2006) (holding that judgments entered by a court having subject matter and personal jurisdiction are not void). However, I still believe such actions are at least "voidable" based on clear procedural error. An action that is "voidable" has a defect or imperfection that can be cured by the ratification or confirmation of a party who could have taken advantage of the defect. *In re Guardianship of A.J.A.*, 991 N.E.2d 110, 114 (Ind. 2013).

[54] Had Larkin decided to object to any of the premature actions by the State or trial judge, I believe there would have been no choice but to sustain such objections. He did not do so, but rather essentially ratified the premature actions. In any case, the actions of the prosecutors and trial judge in withdrawing or recusing and seeking appointment of a special prosecutor before our decision in *Larkin I* was certified inured to Larkin's benefit, in terms of the Rule 4(C) time period: they expedited the progress of the case once our opinion was certified. It would improperly penalize the State to say that it restarted the Rule 4(C) clock before certification of our *Larkin I* opinion. I also note that, if the parties were in agreement that no one would seek transfer or rehearing, they could have jointly asked this court to certify our opinion before the official time period for certification had passed, but they did not do so. Perhaps Larkin was considering filing a rehearing or transfer petition after we dismissed his appeal

as moot and wanted the full amount of time to consider whether to do so.[7] Additionally, it would have been highly inadvisable for the trial court to have attempted to schedule a new trial date before it was clear that our decision in *Larkin I* was final. Consequently, I believe the time period until November 20, 2015, was chargeable to Larkin for Rule 4(C) purposes.

[55] Next, I address the delay associated with Larkin requesting the recusal of Judge Alevizos from the case and the eventual appointment of Judge Blankenship as special judge on February 29, 2016.[8] I find that the caselaw is well-settled on this point: any delay occasioned by a defendant's motion for change of judge is chargeable to the defendant under Rule 4(C). *See State ex rel. Brown v. Hancock Cty. Superior Court*, 267 Ind. 546, 547-48, 372 N.E.2d 169, 170 (1978); *State v. Grow*, 255 Ind. 183, 185, 263 N.E.2d 277, 278 (1970); *Henderson v. State*, 647 N.E.2d 7, 13-14 (Ind. Ct. App. 1995) (describing delay caused by finding special judge qualified to hear case as due to "court congestion"), *trans. denied*. It does not matter that the defendant's request for a change of judge is "justifiable or meritorious." *Grow*, 255 Ind. at 185, 263 N.E.2d at 278. In *Grow*, the period of delay in finding a qualified special judge was six months; in *Brown*, it was

---

[7] In an October 13, 2015 response to the State's request to appoint a special prosecutor, Larkin's attorney did in fact represent that he was still considering filing a transfer petition.

[8] The majority states, "The parties do not dispute the period between November 20, 2015, and December 10, 2015, or twenty days, ran against the Rule 4(C) period . . . ." Slip op. p. 27. However, the State in its opening and reply briefs appears to take the position that Larkin tolled the Rule 4(C) period beginning on November 23, 2015, when he filed his motion for change of judge.

sixteen months. In both cases, our supreme court found the entirety of the delays chargeable to the defendants.

[56] Larkin also contends that Judge Alevizos never should have agreed to accept presiding over this case, or at least should have immediately recused himself after the December 10, 2015 hearing regarding recusal, and the delay in Judge Alevizos not agreeing to step aside until December 31, 2015, should not be chargeable to him. In essence, Larkin argues and the majority agrees that Judge Alevizos had a patently-obvious reason for recusing based on his having presided over a guardianship case involving Larkin's children and his sister. However, neither Larkin nor the majority have cited a case where recusal was required under circumstances similar to those here, nor any Rule of Judicial Conduct that unequivocally mandated Judge Alevizos's recusal. "The law presumes a judge is unbiased and unprejudiced." *Patterson v. State*, 926 N.E.2d 90, 93 (Ind. Ct. App. 2010). In the absence of such clear precedent or rule, I would not say Judge Alevizos had to immediately and automatically recuse himself. In any case, as previously noted, it does not matter whether Larkin had good reason for asking for Judge Alevizos's recusal; the time associated with that request is chargeable to Larkin. In sum, I conclude the time period between Larkin's motion for change of judge on November 23, 2015, and Judge Blankenship's acceptance of the case on February 29, 2016, did not count against the Rule 4(C) time period.

[57] The State concedes that, per the parties' agreement before the interlocutory appeal, it had ninety days from the date of certification of our *Larkin I* opinion

in which to try Larkin, aside from delays attributable to him or court congestion. By my calculations, this results in a latest possible trial date of May 26, 2016—with the Rule 4(C) clock recommencing on November 20, 2015 and then being tolled between November 23, 2015 and February 29, 2016. The trial court eventually scheduled trial to begin on June 20, 2016. The question is whether Larkin waived any objection to this trial date. I agree with the State that he did.

[58] On April 7, 2016, the trial court conducted a pre-trial hearing. Before this, Larkin had already filed a motion for discharge under Rule 4(C), contending the time for trial already had passed. This motion was discussed at the hearing but not ruled upon. Also, defense counsel and the special prosecutor discussed possible trial dates. The special prosecutor offered possible trial dates in early-to-mid May 2016. Defense counsel, however, represented to the trial court that, if in fact it eventually ruled against Larkin's discharge motion, he would rather begin the trial on June 20, 2016. Defense counsel further indicated that he was waiving any speedy trial argument as to a trial on that date. The trial court clarified for the record, to which defense counsel agreed: "He waives it, he waives it to the extent, as I understand, that he has already made a record that the time has run." 4/7/2016 Tr. p. 85.

[59] "As a general rule, when a defendant seeks or acquiesces in a delay, the time limitations set by Criminal Rule 4 are extended by the length of the delay." *State v. Black*, 947 N.E.2d 503, 507 (Ind. Ct. App. 2009). When a defendant agrees to a trial date outside the Rule 4(C) time limit before that time limit has

expired, the defendant waives his or her right to be discharged. *Id.* at 509. Here, defense counsel, at the April 7, 2016 hearing, made it quite clear to the trial court both that (1) he believed the Rule 4(C) time period had expired, but (2) if it had not, he waived any Rule 4(C) complaint as to trial beginning on June 20, 2016. My analysis is that the Rule 4(C) time period did not expire until May 26, 2016; hence, Larkin waived any claim that a trial beginning on June 20, 2016 exceeded the Rule 4(C) period.

I emphasize that, although Criminal Rule 4 places an affirmative duty on the State to speedily bring a defendant trial, it is not intended to provide defendants with a technical means to avoid trial. *Cundiff v. State*, 967 N.E.2d 1026, 1028 (Ind. 2012). I think Larkin may be doing just that. I would hold that the trial court's proferred trial date of June 20, 2016, did not violate Larkin's rights under Criminal Rule 4(C).

## II. *Motion to Dismiss*

Next, I address the trial court and majority's alternative conclusion that the misconduct of police and prosecutors warrants outright dismissal of the case against Larkin. No one disputes that certain prosecutors and law enforcement officers egregiously violated Larkin's constitutional rights. However, our supreme court addressed extremely similar misconduct in *Taylor* and refused to conclude that outright dismissal or suppression of all the State's evidence was required.

[62]     In *Taylor*, the trial court had suppressed all testimony from any officer who had eavesdropped on the defendant's privileged communications with his lawyer, which communications revealed the location of the murder weapon. Our supreme court reversed this ruling, ultimately holding:

> We conclude that a presumption of prejudice, rebuttable only by proof beyond a reasonable doubt, adequately protects Taylor from prejudice caused by the officers' eavesdropping and their assertion of the Fifth Amendment privilege about their actions. Thus, prospectively imposing blanket suppression of all testimony from witnesses pleading the Fifth Amendment is inappropriate.
>
> We reverse the blanket suppression of testimony from witnesses who invoke the Fifth Amendment and remand with instructions to determine as to each presumptively tainted witness whether the State has proven beyond a reasonable doubt an independent source for that witness's testimony without implicating the witness's Fifth Amendment privilege—and therefore without derogating Taylor's right of confrontation. The trial court may, in its discretion, either hold a new suppression hearing or proceed directly to a new trial at which the State may attempt to meet its burden through offers to prove outside the presence of the jury.

*Taylor*, 49 N.E.3d at 1029.

[63]     In my view the State was entitled to attempt to rebut any presumption of prejudice associated with improprieties by prosecutors and police. It may in fact be unable to rebut that presumption, but per *Taylor* it is allowed to at least try. I am quite familiar with the facts of both this case and *Taylor*, and I cannot

say the facts here are so much more egregious than they were in *Taylor* that outright dismissal is an appropriate remedy. In any event, *Taylor* spoke of the possibility that a case of eavesdropping could be so egregious that outright suppression of any eavesdropper's testimony would be warranted; it did not mention the possibility of dismissal of a case as an appropriate remedy.

[64] I vote to reverse the granting of Larkin's motion for discharge under Criminal Rule 4(C) and his motion to dismiss on constitutional grounds, and to remand for trial.