ATTORNEYS FOR RESPONDENT
Donald R. Lundberg
Frank Sullivan, Jr.
Indianapolis, Indiana

ATTORNEYS FOR THE INDIANA SUPREME COURT
DISCIPLINARY COMMISSION
G. Michael Witte, Executive Director
Angie Ordway, Staff Attorney
Indianapolis, Indiana

# In the
# Indiana Supreme Court

No. 46S00-1512-DI-705

FILED
Nov 06 2017, 1:40 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE MATTER OF:

ROBERT NEARY,

*Respondent.*

Attorney Discipline Action
Hearing Officer Sheila M. Moss.

**November 6, 2017**

**Per Curiam.**

We find that Respondent, Robert Neary, committed attorney misconduct by, among other things, eavesdropping on confidential attorney-client communications. For this misconduct, we conclude that Respondent should be suspended for at least four years without automatic reinstatement.

This matter is before the Court on the report of the hearing officer appointed by this Court to hear evidence on the Indiana Supreme Court Disciplinary Commission's "Verified Complaint for Disciplinary Action," and on the post-hearing briefing by the parties. Respondent's 1999 admission to this state's bar subjects him to this Court's disciplinary jurisdiction. *See* IND. CONST. art. 7, § 4.

## Procedural Background and Facts

The Commission filed a two-count "Verified Complaint for Disciplinary Action" on December 17, 2015, and later amended that complaint. As set out more fully below, the amended complaint charged Respondent with professional misconduct in connection with his actions in two criminal cases while serving as the chief deputy prosecutor in LaPorte County. Following a hearing, the hearing officer filed her report on April 28, 2017, finding Respondent committed violations as charged and recommending a sanction ranging from a four-year suspension to disbarment.

*Count 1.* On Friday, March 14, 2014, Brian Taylor was being held in custody at the Michigan City Police Department in connection with a homicide investigation. Attorney David Payne arrived at the station mid-afternoon to meet with Taylor, and Respondent was summoned to the station by the police chief to assist with any issues that might arise. Respondent and detectives escorted Payne to the interview room to meet with Taylor, a detective instructed Payne to flip a toggle switch outside the room "unless you want us listening to your conversation," and Payne did so. However, the switch merely controlled the recording system and did not disable the audio and video feeds, which were controlled in a separate area in the police station referred to as the "war room."

After Payne began his meeting with Taylor, Respondent and several detectives gathered in the war room. They did not disable the audio or video feeds, but rather watched and listened to the confidential attorney-client discussion. Ten to twenty minutes into the interview, Taylor and Payne discussed a gun allegedly used in the incident under investigation, and Taylor told Payne where the gun was located. A few minutes after that, the audio in the war room was disabled, the room was cleared, and Respondent instructed the detectives not to recover the weapon. Notwithstanding Respondent's instruction, two detectives proceeded to the site identified by Taylor during his conversation with Payne and recovered a gun.

Respondent did not initially notify Payne of what had transpired. Three days after Payne's meeting with Taylor, when the police chief learned of the overheard conversation and

2

the subsequent recovery of a gun, the police chief emphasized to Respondent the importance of sharing that information with Taylor's counsel. Respondent then notified counsel of what had happened and self-reported his conduct to the Commission shortly thereafter.[1]

*Count 2*. On December 13, 2012, John Larkin was being held at the Long Beach Police Department (LBPD) in connection with the shooting death of his wife. Larkin had agreed to give a statement to investigators in exchange for being charged with voluntary manslaughter in lieu of murder. Present for this interview were Larkin, Larkin's counsel, Respondent, LaPorte County Prosecutor Robert Szilagyi, and the LBPD officer who conducted the interview. The interview room was monitored by an audio and video feed sent to a control room elsewhere in the police station.

About an hour into the interview, the participants took a short break lasting approximately eleven minutes. Larkin and his counsel remained in the interview room after the others had left. Based on past practices, Szilagyi and Larkin's counsel both believed the LBPD officer in the control room would turn off the recording during the break. However, the recording system was not turned off and continued to record while Larkin spoke with his counsel during the break about several confidential matters, including defense strategy (hereinafter the "break discussion").

Respondent first viewed the DVD of the interview, including the break discussion, about one month later. Respondent watched the entire break discussion even though the privileged status of that discussion either was, or should have been, immediately apparent to Respondent. Respondent provided a copy of the DVD, including the break discussion, to Larkin's counsel but did not mention to counsel that the break discussion had been recorded.

Thereafter, Larkin's counsel filed a motion to dismiss the voluntary manslaughter charge based on the recording of the break discussion. Respondent filed an unsealed response in which he recited the contents of the break discussion, and he attached as exhibits the DVD and a written

---

[1] These events gave rise to an interlocutory appeal, State v. Taylor, 49 N.E.3d 1019 (Ind. 2016), which we address further below.

transcript, both of which included the break discussion. The trial court ordered the transcript and all relevant information be placed under seal and instructed Respondent to resubmit his filing on green paper excluded from public access.[2]

**Discussion**

The Commission alleged, and the hearing officer concluded following an evidentiary hearing, that Respondent violated the following Indiana Rules of Professional Conduct:

4.4(a): Using methods of obtaining evidence that violate the legal rights of a third person (Count 1).

8.4(d): Engaging in conduct prejudicial to the administration of justice (Counts 1 and 2).

Respondent has petitioned this Court to review the hearing officer's findings and conclusions.[3] The Commission carries the burden of proof to demonstrate attorney misconduct by clear and convincing evidence. *See* Ind. Admission and Discipline Rule 23(14)(i) (2016). We review *de novo* all matters presented to the Court, including review not only of the hearing officer's report but also of the entire record. *See* Matter of Wall, 73 N.E.3d 170, 172 (Ind. 2017). While this Court reserves the right to make the ultimate determination, the hearing officer's findings receive emphasis due to the unique opportunity for direct observation of witnesses. Id.

Respondent correctly argues that the appellate holdings in Taylor, Larkin I, and Larkin II are not dispositive of this disciplinary action. *See* Matter of Keiffner, 79 N.E.3d 903, 906 (Ind. 2017) (quoting Matter of Smith, 60 N.E.3d 1034, 1036 (Ind. 2016)). The relevant inquiries in a criminal appeal and disciplinary proceeding are not wholly coextensive, a prosecutor individually does not have the opportunity in a criminal appeal to defend his or her own

---

[2] As addressed further below, these events and others gave rise to an interlocutory appeal, Larkin v. State, 43 N.E.3d 1281 (Ind. Ct. App. 2015) ("Larkin I"), as well as a second appeal following the trial court's granting of Larkin's motions for discharge and dismissal. State v. Larkin, 77 N.E.3d 237 (Ind. Ct. App. 2017) ("Larkin II"), *trans. pending*.

[3] Respondent also has filed a motion for oral argument, which we deny.

4

professional conduct, and extrinsic evidence may be brought to bear in a disciplinary proceeding that paints a "more complete picture" of the prosecutor's conduct than what was reflected in the record available to the appellate court. Id. Respondent points to such extrinsic evidence here – chiefly, his own testimony and that of several of the detectives who participated in the war room eavesdropping – and he argues that, like the respondent attorneys in Smith and Keiffner, he too should be absolved of professional misconduct charges.

However, our dispositions in Smith and Keiffner were predicated in large part on credibility findings favorable to the respondent made by the hearing officer in each case and the emphasis we give such findings. In contrast, the hearing officer who heard the testimony here made comprehensive and well-reasoned credibility findings against Respondent, whose version of events has evolved considerably since his initial self-report to the Commission, and against the detectives who chose to testify here but who had refused to testify about the eavesdropping during the suppression proceedings at issue in Taylor. We find in our *de novo* review ample support for the hearing officer's findings in this regard.

Respondent also argues that there was insufficient prejudice caused by his actions to support a Rule 8.4(d) violation. To be sure, the full scope of damage caused by Respondent's actions and the misdeeds of other law enforcement officials remains to be seen. As of this writing, proceedings in the trial court are ongoing following our remand in Taylor and a petition to transfer is pending in Larkin II. But Respondent's conduct easily meets the threshold for prejudice under Rule 8.4(d) irrespective of the ultimate outcomes in the prosecutions of Taylor and Larkin. Respondent's conduct in both cases fundamentally infringed on privileged attorney-client communications and, at an absolute minimum, has caused significant delays and evidentiary hurdles in the prosecutions of Taylor and Larkin, even assuming they still can be prosecuted at all. Respondent's attempts to downplay the seriousness of his invasion of the attorney-client privilege – for example, by claiming he was not paying close attention to the Taylor-Payne conversation until the gun was mentioned, or by noting the proactive measures undertaken *sua sponte* by the trial court to shield Respondent's filings in response to Larkin's motion to dismiss from public access – are wholly unavailing.

5

In sum, we find sufficient support for the hearing officer's findings and conclusions with regard to each of the charged rule violations. Accordingly, we find Respondent violated Professional Conduct Rule 4.4(a) in Count 1 and Rule 8.4(d) in both counts. We turn now to the question of sanction.

There is, quite thankfully, scant precedent in our disciplinary annals for misconduct such as this. As we wrote in <u>Taylor</u>, the constitutional imperative of honoring and protecting the confidentiality of a defendant's communications with counsel is a principle "[w]e would have hoped . . . too obvious to mention." <u>Id.</u> at 1023. We described the war room eavesdropping in <u>Taylor</u> using words such as "egregious," "flagrant," "unconscionable," "shameful," "abhorrent," and "reprehensible." While <u>Smith</u> and <u>Keiffner</u> confirm that these descriptions are not dispositive in the disciplinary context, nothing in the "more complete picture" adduced during these disciplinary proceedings leads us to view Respondent's conduct with any less outrage or disapproval. In many respects, these proceedings have painted an even more alarming picture of Respondent, in that they show Respondent gradually has retreated from his initial self-report to the Commission and has given evasive and inconsistent explanations and statements regarding the war room eavesdropping. As aptly found by the hearing officer, "Respondent's ever evolving narrative points to a lack of honesty." (Report at 15).

We share the hearing officer's view that "the egregious nature of Respondent's conduct cannot be overstated" and warrants a sanction at the upper end of the disciplinary spectrum. (<u>Id.</u> at 21-22). The Commission urges us to disbar Respondent. The severity of the misconduct and Respondent's repeated transgressions certainly lend support to the notion that he should be disbarred. On the other hand, Respondent has no prior discipline, he self-reported his conduct to the Commission, and several persons testified to his good reputation in the community (although, as noted by the hearing officer, these persons did not appear to have been particularly well-informed of the circumstances giving rise to these disciplinary proceedings). At the end of the day, these considerations persuade us that the door should not permanently be closed on Respondent's legal career and that he should be afforded an opportunity at an appropriate juncture to prove by clear and convincing evidence his professional rehabilitation and fitness to resume practicing law.

**Conclusion**

The Court concludes that Respondent violated Professional Conduct Rules 4.4(a) and 8.4(d). For Respondent's professional misconduct, the Court suspends Respondent from the practice of law in this state for a period of not less than four years, without automatic reinstatement, beginning December 18, 2017. Respondent shall not undertake any new legal matters between service of this opinion and the effective date of the suspension, and Respondent shall fulfill all the duties of a suspended attorney under Admission and Discipline Rule 23(26). At the conclusion of the minimum period of suspension, Respondent may petition this Court for reinstatement to the practice of law in this state, provided Respondent pays the costs of this proceeding, fulfills the duties of a suspended attorney, and satisfies the requirements for reinstatement of Admission and Discipline Rule 23(18). The costs of this proceeding are assessed against Respondent, and the hearing officer appointed in this case is discharged.

All Justices concur.