ATTORNEYS FOR APPELLANT
Gregory F. Zoeller
Attorney General of Indiana

Brian Reitz
Deputy Attorney General
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Elizabeth Flynn
David Payne
Craig V. Braje
Braje, Nelson & Janes, LLP
Michigan City, Indiana



FILED

Mar 30 2016, 1:50 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

_____

# In the
# Indiana Supreme Court

_____

No. 46S04-1509-CR-552

STATE OF INDIANA,

*Appellant,*

v.

BRIAN J. TAYLOR,

*Appellee.*

_____

Appeal from the LaPorte Superior Court 1, No. 46D01-1403-MR-0110
The Honorable Kathleen Lang, Judge

_____

On Petition to Transfer from the Indiana Court of Appeals, No. 46A04-1407-CR-316

_____

**March 30, 2016**

**Rush, Chief Justice.**

A criminal suspect's state and federal rights to counsel and confrontation of witnesses are essential to a fair trial. Here, police officers and a prosecutor eavesdropped on a criminal suspect's pre-interrogation consultation with his lawyer, overhearing information regarding both evidence and trial strategy. Then, when called to testify about that eavesdropping in depositions and a suppression hearing, the officers' invocation of their Fifth Amendment rights against self-incrimination left the suspect with no means of confirming what they heard. The parties agree—as well they should—that the State's egregious misconduct violated the suspect's constitutional rights. Their dispute is only how to remedy that violation.

We hold that the State's intrusion is presumptively prejudicial. But that presumption does not necessarily require blanket suppression—as the trial court here ordered—of all testimony from witnesses who pleaded the Fifth Amendment about the eavesdropping. Rather, the State can rebut the presumption by disproving prejudice beyond a reasonable doubt for every item of tainted evidence and testimony.

Thus, even though the officers' testimony is presumptively tainted by the eavesdropping, they may yet have an independent basis for certain limited testimony, such as routine evidentiary foundation for the unsuppressed exhibits. On those matters, their credibility may be sufficiently "collateral" that neither their Fifth Amendment privilege nor the suspect's confrontation or cross-examination rights will be materially impaired. But because testimonial taint can be subtle and difficult to detect, the State must prove an independent basis *beyond a reasonable doubt* for the entire substance of each witness's testimony. We therefore reverse and remand the prospective blanket suppression of those witnesses' testimony.

### Facts and Procedural History

On March 14, 2014, at some time before 7:30 a.m., Brian Taylor's grandfather dropped him off at the Michigan City Police Department and told him not to talk to the police. Police officers escorted the blood-covered Taylor to an interview room, where he apparently stayed while they investigated. Within hours, police discovered the body of Taylor's girlfriend, Simone Bush, at her grandparents' residence, with a fatal gunshot wound through the neck. Subsequently, at around 3:20 p.m., police arrested Taylor and asked him to sign a document waiving his right to an attorney. He refused.

Around 4:00 p.m., Taylor's attorney David Payne arrived at the police station, and Chief Deputy Prosecutor Robert Neary and Sergeant Steve Westphal accompanied him to the interview room. Sergeant Westphal told Attorney Payne that he should "flip a toggle switch" on the wall "unless you want us listening to your conversation." At 4:12 p.m., Attorney Payne flipped the switch and began talking with his client.

Attorney Payne's conversation with Taylor was transmitted by a live audio feed into a large conference room next door—known at the station as the "War Room"—where the chief deputy prosecutor and an unknown group of police detectives were listening. For the next thirty to forty

2

minutes, the War Room group listened in as Taylor and his attorney discussed "all aspects" of the case, including location of evidence and defense trial strategy. According to Chief Deputy Prosecutor Neary, the officers cut off the audio feed immediately after Taylor revealed the location of a handgun. The officers searched for and retrieved that gun despite Neary's "stern[]" instruction to the contrary.

On March 16, 2014, the State charged Taylor with murder. A few days later, Neary disclosed the eavesdropping. He sent a letter to one of Taylor's attorneys, admitting that

> [a]t the time Mr. Payne entered the interview room to speak with Mr. Taylor the recorder was disabled. However, the video/audio still ran to monitor the events in the interview room which could be watched/listened to in another room.
>
> I was present in the other room and overheard portions of Mr. Payne's and Mr. Taylor's conversation up to the point where Mr. Payne asked Mr. Taylor where the weapon was and Mr. Taylor's response. At that point, the audio portion was disabled as well.
>
> . . . [T]hose present were sternly told not to search for this weapon. However, Monday afternoon I was informed, that despite the warnings, detectives went to the area and located the weapon. The weapon was now in possession of the Michigan City Police Department.
>
> I explained I did not believe the weapon to be admissible under these circumstances. You indicated the issue of admissibility would need to be addressed at a later date.
>
> Finally, . . . I ha[ve] self-reported myself to the Indiana Disciplinary Commission for my conduct. . . .

Taylor promptly deposed Sergeant Westphal and four other detectives involved in the investigation—Lead Detective Al Bush, Corporal Sean Steele, Detective Justin Frever, and Detective Matthew Barr. All five officers asked to consult with counsel about their Fifth Amendment rights against self-incrimination as to all questions relating to the eavesdropping—thereby preventing Taylor from learning who was present in the War Room during the eavesdropping and what information was overheard.

Taylor sought to suppress all information and evidence, including the handgun, obtained after the eavesdropping began at 4:12 p.m., and all testimony of any witness who invoked the Fifth Amendment. He attached to that motion an affidavit filed by Attorney Payne, which stated that the

eavesdropped conversation covered "confidential matters . . . regarding the criminal defense of charges likely to be filed." In response to the motion to suppress, the State stipulated to the suppression of the handgun but asserted that all other evidence and information obtained after 4:12 p.m. had an independent, untainted source.

On what had been scheduled to be the first day of a two-week jury trial, the court held a day-long suppression hearing. The State called Lead Detective Bush and five other officers as witnesses, three of whom invoked the Fifth in response to all questions relating to the eavesdropping. Then Taylor called three more officers, each of whom did likewise—once again preventing Taylor and the court from learning the identity of the eavesdroppers and what exactly they overheard. Three of the officers—Detectives Bush, Barr, and Frever—were among the five who had invoked their Fifth Amendment rights in depositions. Three others—Detectives David Cooney, Gregory Jesse, and Jason Costigan—had not previously testified.

In Judge Kathleen Lang's commendably thorough written order issued the next morning, the trial court partially granted the motion to suppress. The court found that even though the officers' assertion of the Fifth Amendment "added [a] layer of . . . difficulty," the State had proved "an independent source of information . . . in no way connected to the" eavesdropping for most (though not all) of its planned exhibits. Some were recovered before 4:12 p.m. when the eavesdropping began, and therefore were not challenged; and others were part of a standard homicide investigation.

The trial court then turned its attention to the officers' invocation of their Fifth Amendment privilege. Despite finding at least some of the post-eavesdropping evidence admissible, the court ordered blanket suppression of trial testimony from any witness "who has asserted the Fifth Amendment right of silence in a deposition or during testimony at the hearing on the Motion to Suppress," and stated that it would "stri[ke] in its entirety" the testimony of any witness who did so at trial. The court was concerned that absent "exceptional circumstances," the Fifth Amendment privilege should not be invoked in the jury's presence. It recognized that blanket suppression was "an extraordinary remedy," but found that it was warranted in view of "the egregious actions by the police and the State," and because the officers' Fifth Amendment privilege would violate Taylor's Sixth Amendment right to confront and cross-examine them about what police overheard, who overheard it, whom they told about what they heard, and what actions they took as a result.

4

On the State's motion, the trial court stayed the trial and certified that order for interlocutory appeal and ordered Taylor released because the seventy-day speedy trial deadline expired that day. On appeal, the State did not challenge the requirement that it demonstrate an independent source for evidence and information obtained after 4:12 p.m. but argued that blanket suppression was "extreme." State v. Taylor, 35 N.E.3d 287, 295 (Ind. Ct. App. 2015). In a split decision, the Court of Appeals agreed with the State, reversing the pretrial blanket suppression of all testimony from officers who pleaded the Fifth, declining to presume prejudice from the State's conduct. Id. at 302–03. Judge May dissented, concluding that blanket suppression of officer testimony was warranted, even before trial, based on the State's failure to disprove prejudice beyond a reasonable doubt. Id. at 305 (May, J., dissenting). We granted transfer, thereby vacating the opinion of the Court of Appeals. Ind. Appellate Rule 58(A). Additional facts are set forth below.

**Standard of Review**

The State, in appealing from the partial grant of Taylor's motion to suppress, must show the ruling was contrary to law. State v. Washington, 898 N.E.2d 1200, 1203 (Ind. 2008). We defer to the specific findings of fact the trial court included in its order, neither reweighing evidence nor reassessing witness credibility. State v. Keck, 4 N.E.3d 1180, 1183 (Ind. 2014). And we will affirm if the record discloses "substantial evidence of probative value" supporting the order. Id. (quoting State v. Quirk, 842 N.E.2d 334, 340 (Ind. 2006)). But we review de novo the trial court's conclusions of law, including determinations of whether Taylor's constitutional rights have been violated. See Speers v. State, 999 N.E.2d 850, 852 (Ind. 2013).

**Discussion and Decision**

The right to counsel, enshrined in both the United States and Indiana Constitutions, is essential to liberty. The State is never more awesomely powerful, nor is the individual more vulnerable, than in a criminal prosecution—and likewise, the individual's ability to consult privately with a lawyer is never more precious. No matter how gruesome and senseless a crime, or how confident law enforcement may be about a suspect's guilt, investigators are never justified in eavesdropping on a suspect's communications with counsel. The right to counsel would be a charade unless it guarantees privacy in those consultations, because a suspect's candor with counsel cannot come at the price of self-incrimination.

We would have hoped that principle too obvious to mention. Yet here, Chief Deputy Prosecutor Neary's letter confirms that more than one law enforcement official flagrantly and unconscionably disregarded that safeguard—eavesdropping on privileged attorney-client communications while turning a deaf ear to the Constitutions they swore to uphold. Those officers have not only violated Taylor's constitutional rights to counsel but have also betrayed public trust.

Our condemnation of this shameful eavesdropping, however, must not cloud our analysis of the legal principles at stake. Before us is a motion to suppress, not a motion for sanctions—and what constitutes an effective *remedy* for Taylor is not necessarily what would constitute a proportionate *punishment* for the State. Our concern is to ensure the State's egregious misconduct does not actually prejudice Taylor—that is, that no tainted evidence or testimony is admitted against him. Punishing the wrongdoers is a separate matter not before us today.

From that remedial perspective, prospectively excluding all eavesdropping officer testimony goes too far. Even flagrant constitutional violations, though *presumptively* prejudicial, are not *necessarily* so—as illustrated by the trial court's unchallenged "independent source" findings as to many of the State's exhibits. But while the independent-source inquiry is relatively straightforward for tangible evidence, testimonial taint is more subtle and insidious. Having stolen Taylor's strategic "playbook," these witnesses can potentially shade their testimony to undercut his defense—yet, by pleading the Fifth, they impede his ability to cross-examine for such bias. Under these circumstances, then, we will require the State to disprove taint beyond a reasonable doubt.

The eavesdroppers' invocation of the Fifth Amendment will make it exceedingly difficult for the State to carry that heavy burden. But even though we share the trial court's desire to avoid the privilege being invoked in the jury's presence, this record does not yet foreclose the possibility that these witnesses might give limited foundational testimony without significantly implicating their credibility—or their Fifth Amendment privilege—as to those matters. If the State can carry its burden within the strictures we announce today, Taylor's confrontation and cross-examination rights will not be infringed. And if it cannot, perhaps the same law-enforcement personnel whose bold misconduct sabotaged the prosecution will likewise be bold enough to personally deliver that news to Simone Bush's family.

## I. Law Enforcement Eavesdropping on Attorney-Client Communications Violates Federal and Indiana Constitutional Rights to Counsel.

Before discussing how to remedy the State's constitutional misconduct, we pause briefly to discuss the nature of these violations.

A criminal suspect's right to counsel is a cornerstone of a fair trial, guaranteed by both the Sixth Amendment to the United States Constitution and Article 1, Section 13 of the Indiana State Constitution. These separate provisions extend similar protections—the right to counsel at any critical stage of a criminal proceeding "where counsel's absence may derogate from the accused's right to a fair trial." Caraway v. State, 891 N.E.2d 122, 126 (Ind. Ct. App. 2008). However, the Indiana right provides greater protection because it attaches earlier—upon arrest, rather than only when "formal proceedings have been initiated" as with the federal right. See Taylor v. State, 689 N.E.2d 699, 703–04 (Ind. 1997) (internal quotation marks omitted). Under either Constitution, though, the right to counsel goes hand-in-hand with attorney-client privilege, which recognizes the necessity of a defendant conferring *privately* with counsel.

Here, the law-enforcement eavesdropping unquestionably interfered with that ability to confer privately as guaranteed by both Constitutions. The Sixth Amendment right to counsel attached when the State charged Taylor. See U.S. v. Gouveia, 467 U.S. 180, 185 (1984) (holding federal right to counsel attaches upon initiating "formal judicial proceedings"). And the Section 13 right to counsel attached even earlier, when the police arrested Taylor an hour before the eavesdropping commenced. See Taylor, 689 N.E.2d at 703–04. And there appears to be no dispute that the eavesdropping violated those rights—indeed, the parties stipulated to suppression of the handgun and any other evidence "derived directly from the improper eavesdropping by officials of the state of a confidential attorney privileged conversation." As a result, the trial court suppressed any exhibit for which it found that the State had failed to establish an independent source. Since that aspect of the trial court's ruling is unchallenged, we consider only what remedy is necessary as to the potentially tainted testimony. As set forth below, we presume that testimony to be tainted, unless the State can disprove taint beyond a reasonable doubt by establishing an independent source for the testimony without implicating the witnesses' Fifth Amendment privilege.

## II. Blanket Suppression of Testimony from State Witnesses Who Invoke the Fifth Amendment Is Premature.

Taylor asserts the blanket suppression imposed below is sustainable on three grounds: the eavesdropping itself violated his Indiana and federal constitutional rights to counsel; the officers' pleading the Fifth about the eavesdropping violated his Sixth Amendment right to confront witnesses; and the prosecutor's participation in the eavesdropping constituted prosecutorial misconduct. We address each argument in turn.

### A. *The right to counsel does not support prospective, blanket suppression of potentially untainted testimony.*

The United States Supreme Court has rejected the view that all right-to-counsel intrusions give rise to a per se—that is, irrebuttable—presumption of prejudice. See Weatherford v. Bursey, 429 U.S. 545, 550–51 (1977). In Weatherford, after being convicted of a crime and serving his sentence, Bursey brought a Section 1983 claim against an undercover police officer, alleging the officer violated his Sixth Amendment right to counsel by sitting in on pretrial meetings between Bursey and his lawyer. Id. at 547–48. The Court, however, held that presuming prejudice irrebuttably would "cut[] much too broadly," id. at 557, as it was clear under those particular circumstances that the undercover officer's intrusion created no "realistic possibility" of actually prejudicing Bursey at trial, see id. at 551–52, 558. Although the undercover officer may have heard confidential information in the attorney-client meeting, the district court expressly found that he did not communicate that information to police or the prosecution, so that "no tainted evidence" was admitted against Bursey at trial. Id. at 549, 558.

Similarly, we disavowed any irrebuttable presumption of prejudice in Malinski v. State, 794 N.E.2d 1071 (Ind. 2003). There, a defendant charged with murder claimed police violated his right to counsel when they seized "legal documents" from his jail cell. Id. at 1081 (emphasis omitted). But the legal documents were "not used at trial for any purpose"—and so, like Weatherford, we refused to *presume* prejudice where no *actual* prejudice existed. Id. at 1082.

In view of Weatherford and Malinski, we reiterate that even though eavesdropping on attorney-client communications is reprehensible, "there are rare circumstances where there is no possibility of [actual] prejudice to the defendant." State v. Fuentes, 318 P.3d 257, 262 (Wash. 2014). We therefore decline to uphold the blanket suppression of officer testimony because, as discussed

below, we do not yet know whether such a "rare circumstance[]" might manifest in this case. Just as an irrebuttable presumption "cut[] much too broadly" in Weatherford because no tainted evidence was admitted at trial, it would cut much too broadly here—because the officers might give certain limited, untainted testimony, such as laying foundation for the unsuppressed evidence. As the trial court found, the untainted evidence includes, but is not limited to, fingerprints lifted from the crime scene, Tr. 98; bullet fragments collected at the scene, Tr. 187; blood stain swabs, Tr. 98–100; spent shell casings, Tr. 99; hair fibers, Tr. 196; and publicly viewable content from Taylor's Facebook page, Tr. 159–60. Indeed, some officers testified that the decision to collect certain items of evidence was "standard procedure" in any criminal investigation. See, e.g., Tr. 187–88 (regarding decision to send shell casings to a firearms examiner for analysis); Tr. 190 (regarding decision to photograph victim's body at scene); Tr. 202 (regarding decision to send to crime lab a red stain collected at scene); Tr. 243–44 (regarding decision to photograph blood stains at scene). Barring the State from presenting even such limited testimony as evidentiary foundation, if it is truly untainted, would overcompensate—going beyond eliminating actual prejudice to Taylor.

Thus, this record does not yet support blanket suppression of officer testimony on the basis of Taylor's right to counsel. We now consider whether blanket suppression is sustainable on a different ground—Taylor's Sixth Amendment confrontation right.

> B. *The confrontation right does not support prospective blanket suppression of the officers' testimony, as the scope of their direct testimony at trial is not yet known.*

Taylor does not dispute that the officers are entitled to invoke the Fifth Amendment. He asserts, rather, that their invoking the Fifth about the eavesdropping violates his Sixth Amendment right to cross-examine them, and that this violation warrants completely barring them from testifying at trial, before their trial testimony is known.

The Sixth Amendment Confrontation Clause establishes that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The "main and essential purpose" of this Clause is to guarantee criminal defendants the opportunity to conduct effective cross-examination at trial, testing the truthfulness of a witness's direct examination testimony. Delaware v. Fensterer, 474 U.S. 15, 19 (1985) (quoting Davis v. Alaska, 415 U.S. 308, 315 (1974)).

9

The Sixth Amendment confrontation right, however, occasionally comes into conflict with the Fifth Amendment right against self-incrimination. This occurs where, as here, a State witness invokes the Fifth in order to refuse to answer a question on cross-examination. Recognizing this tension, "courts must watch vigilantly to ensure that the invocation [does] not 'effectively . . . emasculate the right of cross-examination itself.'" U.S. v. Zapata, 871 F.2d 616, 623 (7th Cir. 1989) (omission in original) (quoting Fensterer, 474 U.S. at 19). Accordingly, it may become "'necessary to strike the direct testimony' of a nonresponding witness," id. at 623 (quoting Dunbar v. Harris, 612 F.2d 690, 692 (2d Cir. 1979))—or the witness's entire testimony in "extreme" cases—to ensure that a witness's Fifth Amendment right does not eviscerate a party's right to cross-examine, id. at 624 (quoting United States v. Lord, 711 F.2d 887, 892 (9th Cir. 1983)).

The test for determining whether to strike direct testimony of a nonresponding witness distills into two simple principles. If the witness's refusal to answer prevents the defendant from "*directly assailing the truth* of the witness' testimony," then the court should strike the relevant portion of the testimony. Id. at 623 (emphasis added) (quoting United States v. Humphrey, 696 F.2d 72, 75 (8th Cir. 1982)). But if the refusal to answer "relates only to *collateral matters*, such as credibility," then the danger to defendant is considerably less, and no testimony need be stricken. Id. at 624 (emphasis added) (quoting Humphrey, 696 F.2d at 75). This test, therefore, depends on the exact scope of direct examination testimony.

Here, though, the testimony at the suppression hearing focused on establishing an independent source for the various exhibits, shedding little light on what the scope of the officers' testimony about those exhibits might be. But the extent to which they were able to establish an independent source for those exhibits without implicating their Fifth Amendment privilege lends credence to the State's argument that those witnesses are potentially untainted as to limited matters such as establishing foundation for the unsuppressed exhibits. If the State can make that showing as discussed below, the eavesdropping, and its implications for the witnesses' credibility, may constitute a "collateral" matter that does not eviscerate Taylor's cross-examination right. Blanket suppression was therefore premature.

### III. The State As the Wrongdoer Must Disprove Taint Beyond a Reasonable Doubt for All Presumptively Tainted Testimony.

Even though, again, we find the State's abhorrent misconduct inimical to a free society, that outrage cannot cloud our legal analysis. In Lafler v. Cooper, the United States Supreme Court

directed that a Sixth Amendment remedy "must 'neutralize the taint' of a constitutional violation, while at the same time not grant a windfall to the defendant or needlessly squander the considerable resources the State properly invested in the criminal prosecution." 566 U.S. ___, ___, 132 S. Ct. 1376, 1388–89 (2012) (citation omitted). On this not-fully-developed record, the trial court's pretrial blanket suppression of officer testimony "overcorrects." It amounts to finding an *irrebuttable* presumption of prejudice—which crosses the line from rightly shielding Taylor from *actual* prejudice to granting him a windfall against a potentially still-viable murder prosecution. We conclude that a presuming of taint, rebuttable only beyond a reasonable doubt, strikes a better balance.

The eavesdropping here gives the State two unfair advantages. One is learning the whereabouts of *evidence* it would not otherwise discover, like the handgun. The trial court here addressed that prejudice by applying the exclusionary rule, under which unconstitutionally seized evidence "is generally not admissible in a prosecution . . . absent evidence of a recognized exception" to the rule. Clark v. State, 994 N.E.2d 252, 260 (Ind. 2013). One such exception is the "ultimate discovery exception," which applies when the State can show "by a preponderance of the evidence" that it had an independent source for discovering the evidence. Nix v. Williams, 467 U.S. 431, 444 (1984). Here the court applied that exception to the other various exhibits and neither party challenges the court's "independent source" findings.

The State's second unfair advantage, however—learning *defense strategy*—is more insidious and therefore warrants a unique and more stringent remedy. Having stolen Taylor's strategic "playbook," tainted witnesses can preemptively shade their testimony to undermine that strategy. Shading testimony based on ill-gotten strategic insight is more difficult to detect, but just as damaging to the fairness of an adversarial proceeding. Unfortunately, the extent to which the State actually prejudiced Taylor by capitalizing on both these advantages is, in the State's words, "shrouded in a fog of uncertainty," especially considering the officers' refusal to reveal what was overheard and by whom.

But because the State placed Taylor in that "fog," the State should likewise bear the burden of disproving prejudice. Unlike the exclusionary rule for tangible evidence, though, we believe the State must disprove this more-insidious testimonial taint beyond a reasonable doubt. See Harden v. State, 576 N.E.2d 590, 593 (Ind. 1991) ("Before a constitutional error can be held harmless, the Court must be sufficiently confident to declare the error harmless beyond a reasonable doubt.");

11

see also Fuentes, 318 P.3d at 262 (holding in virtually identical circumstances that "[t]he proper standard the trial court must apply is proof beyond a reasonable doubt with the burden on the State"). We are well aware that the officers' invocation of the Fifth Amendment will make disproving taint difficult. And if that means a loss for the prosecution, so be it. The State cannot be permitted to put Taylor in this "trick bag," and then demand that he bear the burden of getting out of it. Nor may the State demand that he tolerate lingering doubts about the extent to which he has been prejudiced by its own misdeeds.

And given that this stringent rebuttable presumption requires the State not just to prove a negative, but to do so beyond a reasonable doubt, the State must be given a full opportunity to meet that burden—an opportunity it has not yet had, since the suppression hearing focused on disproving taint only as to the State's *exhibits*, not the officers' *testimony*. Because Weatherford suggests that a "realistic possibility" of prejudice is all it takes, 429 U.S. at 558—a fairly low threshold—these witnesses are probably tainted for nearly any aspect of their testimony.

But "nearly" is not "all." For example, again, the State suggests that the tainted officers could still testify to lay foundation for the extensive evidence the trial court did not suppress.[1] As the State points out, such testimony might be sufficiently routine that there would be no "realistic possibility" of the officers' misconduct contaminating that portion of their testimony. Barring the State from presenting even that much before determining whether it can disprove taint would be a windfall to Taylor, disproportionate to the prejudice he has actually suffered from the intrusion into the attorney-client communications.

In other circumstances, it is quite possible that the taint of a "stolen playbook" would be so pervasive and insidious that no remedy short of barring the tainted witnesses entirely would be adequate. But we need not decide that larger question today—and we hope no future case of this

---

[1] As previously discussed, the list of evidence allegedly obtained before 4:12 p.m. or otherwise untainted is extensive. According to the detectives' testimony at the suppression hearing, such evidence includes, but is not limited to, the following: photographs of the victim taken at the scene, Tr. 190; fingerprints lifted from a blood stain, Tr. 98; a copper piece of metal from the couch at the crime scene, Tr. 98; a red stain swab from the heater vent, Tr. 98; a red stain swab from a window curtain, Tr. 98; a red stain swab from window glass and frame, Tr. 99; a red stain swab from the floor, Tr. 99; a red stain swab from the wall, Tr. 100; a red stain swab from the steering wheel of a gray Buick, Tr. 100; fingerprint swabs from Taylor, Tr. 101–02; buccal swabs from Taylor, Tr. 102; a backpack full of .40 caliber bullets, Tr. 100; eleven spent .40 caliber shell casings, Tr. 99; three spent .380 caliber shell casings, Tr. 99; a bullet fragment, Tr. 187; and hair fibers from the wall, Tr. 196.

type forces us to do so. Under these facts, the extent to which the officers were able to testify before invoking the Fifth persuades us that at least part of their testimony might be untainted. We leave it to the trial court on remand to weigh the evidence and assess witness credibility on that point.

**IV. Taylor's Prosecutorial Misconduct Claim Need Not Yet Be Addressed.**

We review a prosecutorial misconduct claim using a two-step analysis. First, there must be misconduct; and second, the misconduct must have placed the defendant in a position of grave peril. Ryan v. State, 9 N.E.3d 663, 667 (Ind. 2014). "The gravity of the peril is measured by *the probable persuasive effect* of the misconduct *on the jury's decision* rather than the degree of impropriety of the conduct." Id.

But here, in light of the State's heavy burden at trial to disprove prejudice beyond a reasonable doubt, it is far from inevitable that the fruits of the prosecutor's misconduct (ill-gotten evidence and defense strategy) will even reach the jury. Therefore, although we find the prosecutor's malfeasance reprehensible, Taylor's prosecutorial misconduct claim cannot carry the day—not yet, at least.

**Conclusion**

We conclude that a presumption of prejudice, rebuttable only by proof beyond a reasonable doubt, adequately protects Taylor from prejudice caused by the officers' eavesdropping and their assertion of the Fifth Amendment privilege about their actions. Thus, prospectively imposing blanket suppression of all testimony from witnesses pleading the Fifth Amendment is inappropriate.

We reverse the blanket suppression of testimony from witnesses who invoke the Fifth Amendment and remand with instructions to determine as to each presumptively tainted witness whether the State has proven *beyond a reasonable doubt* an independent source for that witness's testimony without implicating the witness's Fifth Amendment privilege—and therefore without derogating Taylor's right of confrontation. The trial court may, in its discretion, either hold a new suppression hearing or proceed directly to a new trial at which the State may attempt to meet its burden through offers to prove outside the presence of the jury. In all other respects, we affirm the trial court.

Dickson, Rucker, David, and Massa, JJ., concur.

13