## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 17 2020, 10:00 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

James Harper
Deputy Public Defender
Harper & Harper, LLC
Valparaiso, Indiana

ATTORNEY FOR APPELLEE

Ian McLean
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Brian Taylor,<br>*Appellant/Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee/Plaintiff.* | June 17, 2020<br><br>Court of Appeals Case No.<br>18A-CR-2086<br><br>Appeal from the LaPorte Circuit Court<br><br>The Hon. Thomas Alevizos, Judge<br><br>Trial Court Cause No.<br>46C01-1403-MR-110 |

**Bradford, Chief Judge.**

# Case Summary

On the morning of March 14, 2014, Brian Taylor was at the Michigan City home of his girlfriend Simone Bush when the two began to argue. They struggled; Taylor shot Bush once in the neck, killing her; and Taylor fled. Police began an investigation when Taylor and his grandfather arrived soon thereafter at a Michigan City police station. Officers found Bush dead at her house and obtained search warrants for the house, Taylor's vehicle, and Taylor's person, all of which were executed that day. Taylor was arrested at 3:20 p.m.

At 4:12 p.m., Taylor met with his attorney in an interview room at the police station, and police officers in an adjacent room were able to eavesdrop on their conversation and illegally did so. The conversation included discussion about Taylor disposing of a firearm, which led to the recovery of a firearm from an apartment complex. On March 16, 2014, the State charged Taylor with murder.

After the State informed Taylor that the conversation with his attorney had been overheard, he moved to suppress all evidence collected after 4:12 p.m., and, after a hearing, the trial court ruled, *inter alia*, that evidence related to the handgun recovered from the apartment complex was to be suppressed. The Indiana Supreme Court affirmed the suppression of the handgun but concluded that evidence collected after 4:12 p.m. that could be shown to have come from a source independent of the overheard conversation was admissible.

[4] After a mistrial was declared in Taylor's first jury trial, he was tried a second time in June of 2018. Over Taylor's objections of witness taint, Detective Patrick Cicero was allowed to testify regarding his analysis of blood patterns at the scene and on Taylor's clothing, and forensic pathologist Dr. Joseph Prahlow was allowed to testify that Bush's manner of death was homicide. The jury found Taylor guilty as charged, and the trial court sentenced him to sixty years of incarceration. As reordered, Taylor contends that (1) the trial court abused its discretion in allowing Detective Cicero and Dr. Prahlow to testify and in admitting evidence related to certain messages on Facebook and Dr. Prahlow's testimony that the manner of Bush's death was homicide; (2) the State produced insufficient evidence to sustain his murder conviction; and (3) his sentence is inappropriately harsh. Because we disagree with all of Taylor's contentions, we affirm.

## Facts and Procedural History

### *Facts of Bush's Death and the Police Investigation*

[5] On the evening of March 13, 2014, Taylor spent the night with Bush in the house she shared with her grandmother Louise Kelly, her step-grandfather Darrell Kelly, Sr., and Chanel Turner, among others. Early the next morning, Turner, who lived in the basement with her children, heard wrestling in Bush's bedroom above her followed by what sounded like a gunshot. Darrell heard a "thump, like something being knocked over" at around 6 a.m. and saw Taylor quickly drive away shortly thereafter. Tr. Vol. IV p. 19. At approximately 7:35 a.m., Taylor arrived at a Michigan City police station with his grandfather, who

gave Taylor's driver's license to the police, told them that "something had gone on," and advised Taylor not to say a word until his attorney arrived. Tr. Vol. II p. 55. Taylor had Bush's blood on his shirt, pants, and hands.

[6] At 8:20 a.m., Detective Francisco Rodriguez of the Michigan City Police Department ("MCPD") searched Facebook and found an account under Taylor's name which included a photograph of him. Another officer had learned that Taylor had a girlfriend who was possibly named Simone, so Detective Rodriguez searched the Facebook account and found that Taylor had a Facebook friend named Simone Bush. The Facebook page showed several messages from around 5:00 a.m. that morning, including "I'm dat n[****] with the fat heat keep you runnin like a track meet" and "How you don't think you dont gotta please yo man … Goofy[.]" State's Ex. 7. After Detective Rodriguez learned Bush's address, several police officers went to investigate.

[7] When police arrived, they asked to check Bush's bedroom, and MCPD Detective Matthew Barr forced her bedroom door open far enough to see her behind the door; she was dead, her eyes were open, her face was bloody, and she was lying in a large pool of blood. Officers also noticed a hole in the wall outside the bedroom, a mark in the ceiling of an adjacent room, and what was later determined to be the fatal bullet on a couch underneath the mark in the ceiling. There were footprints in the snow leading from Bush's bedroom window to the driveway, the bedroom window was partially open, and the windowsill bore what appeared to be bloodstains.

[8] A search warrant for the house was issued at approximately 11:00 a.m., and officers who executed the warrant included Detective Cicero of the LaPorte County Sheriff's Department and Detective David Cooney of the MCPD. Bloodstains on the wall behind Bush's body bore arcing characteristics of arterial gush or spurt, while other stains on the wall had the characteristics of transfer stains. Bush had died from a gunshot wound to her neck at contact range. The direction of the gunshot was from her left to right, front to back, and upwards. The bullet had travelled through the base of Bush's brain, severing her spinal cord, fracturing her skull, and severing her carotid artery, causing her circulatory system to pump blood out of the wound for a short while until blood loss caused unconsciousness and death.

[9] Officers determined that the fatal bullet had come from a gun fired in Bush's bedroom, striking her and passing through the wall at a height of approximately five feet at an upward angle before hitting the ceiling in the next room and falling to the couch. Although officers did not find any firearms at the scene, they did find a shipping invoice addressed to Taylor for an SGM tactical Glock magazine for .40 caliber ammunition and several spent casings for .40 caliber rounds in Bush's room. Bush was also known to have a mobile telephone, but it was not found at the scene. Officers later attempted to recover both Taylor's and Bush's mobile telephones, with no success. Officers finished processing the scene between 3:00 p.m. and 4:00 p.m. A search of Taylor's vehicle yielded, *inter alia*, a backpack that contained empty boxes for two Glock handguns, one model 22 and one model 23, both of which take .40 caliber ammunition.

Taylor was arrested at 3:20 p.m., and attorney David Payne arrived at the police station while officers were executing a search warrant for Taylor's person, which revealed several scratches on his chest and arms. At 4:12 p.m., MCPD Detective Stephen Westphal and LaPorte County Chief Deputy Prosecuting Attorney Robert Neary showed Payne into an interview room, where Taylor was waiting. Detective Westphal told Payne to flip a toggle switch to prevent anyone outside the room from hearing his conversation with Taylor, and Payne did so. An adjacent room, referred to as the "war room," was used by officers to work on cases. As it happened, the switch Payne had activated in the interview room did not prevent persons in the war room from hearing conversations in the interview room.

> For the next thirty to forty minutes, the War Room group listened in as Taylor and his attorney discussed "all aspects" of the case, including location of evidence and defense trial strategy. According to Chief Deputy Prosecutor Neary, the officers cut off the audio feed immediately after Taylor revealed the location of a handgun.

*State v. Taylor*, 49 N.E.3d 1019, 1021 (Ind. 2016) ("*Taylor I*").

Detective Cooney was among those present in the war room and overheard at least some of the conversation between Payne and Taylor, which included discussion of the disposal of a firearm. Despite Neary's instruction not to search for the firearm, some officers did, which led to the recovery of a Glock 22 whose serial number matched the serial number on one of two Glock containers found in Taylor's vehicle. Officers followed up on the other Glock container found in Taylor's backpack and determined that the Glock 23 with

the matching serial number had been purchased by Bush. The Glock 23 was later recovered by Chicago police and examined by South Bend Police Officer Ray Wolfenbarger. Officer Wolfenbarger determined that the Glock 23 was fully operational and could have fired the bullet that killed Bush.

[12] Detective Cooney, in addition to assisting at the scene, also helped execute the search warrant on Taylor's vehicle and helped Detective Cicero move Taylor's clothing to the basement. Detective Cicero examined Taylor's clothing beginning shortly after 4:40 p.m. on March 14, 2014. Detective Cicero could not specifically remember sharing his opinions and thoughts when processing Taylor's clothes but testified later that his examination was consistent with his normal practices and that he may have spoken with Detective Cooney. Detective Cicero, who had already examined bloodstains at the scene, documented bloodstains found on Taylor's clothing and later prepared initial and supplemental bloodstain pattern analysis reports detailing his findings. On April 15, 2014, Detective Cicero further examined the interior of Taylor's clothing, including a microscopic examination.

[13] Detective Cicero determined that bloodstains found on the front of Taylor's undershorts displayed small-diameter stains, indicating that Bush's blood had been dispersed into individualized droplets. Stains on the left rear side displayed a different type of pattern, indicating that the shorts had come into contact with the source of the bloodstains. Stains on the inside front waistband of Taylor's blue jeans near the fastening button, the lower outside left leg near the cuff, the rear outside waist area, and on the outside front left pocket of the

jeans were all made leaving a contact pattern, consistent with a bloody hand making contact with the undershorts. The outside of Taylor's shirt displayed similar contact stains, although one area might have been made by pattern transfer, which is left when a patterned object with blood on it presses into the surface leaving a mark. As for the scene, the bloodstain on the heater vent under Bush's bedroom window displayed the characteristics of a gravity stain, made by blood falling onto a surface. Detective Cicero's written reports also relied on DNA analysis showing that Taylor's skin was found under Bush's fingernails. Detective Cicero's supplemental report included the following conclusion:

> At the time of the bloodletting event it is believed the suspect was in contact and/or close proximity to the decedent only wearing the aforementioned polyester shorts and ankle length socks. The suspect subsequently dressed while the bloodstains on his being were still wet which created the bloodstain patterns consistent with being contact transfer on the interior and exterior sides of his clothing.

Supp. App. p. 57.

[14] Neither of Detective Cicero's reports concluded that Taylor had been the shooter or that there had been a physical conflict immediately before the shooting. Detective Cicero's work on the case followed standard procedures and relied on his inspection of physical evidence. Detective Cicero was never in the war room on March 14, 2014, and did not hear any of the conversation between Taylor and Payne, only learning about it "a considerable time" later from another person. Tr. Vol. III p. 116. Detective Cicero could not recall who

this person was, but recalled that the person had said "something to do with a firearm." Tr. Vol. III p. 103.

[15] On March 17, 2014, Bush's autopsy was performed by Dr. Prahlow and was attended by Detective Cooney and LaPorte County Deputy Coroner Mark Huffman. Detective Cooney recalled speaking with Dr. Prahlow and explaining a "scenario that [Bush] had received a gunshot wound" and "the circumstances surrounding the scene itself. How she was found. Where she was in the room. The extent of what we knew of the injuries." Tr. Vol. II pp. 101, 145–46. At some point, Detective Cooney shared with Dr. Prahlow his theory that a struggle or some kind of confrontation had occurred between Bush and Taylor. Detective Cooney's hypothesis was based on the presence of blood on Taylor's hands and the "directionality of the bullet that was discovered showed that she was up against a wall, that the round entered through the left side of her neck[.]" Tr. Vol. III p. 68. Detective Cooney's theory was also based on the scratches found on Taylor's chest and arm. Detective Cooney later testified that his opinions were not influenced by anything Taylor and Payne had said to one other in the interview room.

[16] Dr. Prahlow's report was issued on April 22, 2014, and, *inter alia*, noted under the heading "circumstantial history" that "the decedent was reportedly shot in the neck by her boyfriend during an altercation." Supp. Ex. Vol. p. 60. Dr. Prahlow could not recall who had told him about a struggle or altercation between Bush and Taylor: "Again, I don't have the specific person. It would either be the deputy corner in attendance, Mr. Mark Huffman, or perhaps a

police officer in attendance, Officer David Cooney. I also have [Detective] Cicero listed on my intake form as well." Tr. Vol III p. 162.

### *Procedural Facts*

[17] Meanwhile, on March 16, 2014, the State had charged Taylor with Bush's murder. On June 10, 2014, Taylor filed a motion to suppress after the State notified Payne that officers had overheard their conversation in the interview room. On June 16 and 17, 2014, the trial court held a suppression hearing at which Taylor argued that all evidence obtained after 4:12 p.m. on March 14, 2014, should be suppressed. On June 17, 2014, the trial court ruled that evidence related to the Glock 22 recovered by police in Michigan City should be suppressed, that numerous other pieces of physical evidence did not need to be suppressed, and deferred ruling on the admissibility of certain other items. The trial court also ruled that several police witnesses who had asserted the privilege against self-incrimination at the suppression hearing were barred from testifying as the case progressed. On June 19, 2014, the trial court later clarified its order to allow the admission of evidence collected before 4:12 p.m. on March 14, 2014, and reiterated that the burden was on the State to establish that evidence collected after 4:12 p.m. was admissible at trial.

[18] The State appealed, and while the Indiana Supreme Court ultimately affirmed the trial court's rulings regarding the admissibility of physical evidence, it concluded that the trial court's blanket suppression of witness testimony was an inappropriate remedy. *See Taylor I*, 49 N.E.3d 1026–28. The *Taylor I* Court determined that the appropriate remedy was to remand for the trial court to

determine "as to each presumptively tainted witness whether the State has proven *beyond a reasonable doubt* an independent source for that witness's testimony[.]" *Id.* at 1029 (emphasis in *Taylor I*). The *Taylor I* Court did not address Taylor's prosecutorial misconduct claim because the impact of prosecutorial misconduct is measured by its probable persuasive effect on the jury's decision and no trial had yet occurred. *Id.*

[19] On August 28 and 29, 2017, the trial court held a second suppression hearing. On January 23, 2018, the court ruled that (1) all physical evidence collected and testimony regarding officers' observations made prior to 4:12 p.m. on March 14, 2014, was admissible; (2) evidence related to the Glock 22 recovered by officers in Michigan City was inadmissible; and (3) evidence related to the Glock 23 recovered by police in Chicago was inadmissible, although the question could be revisited in further proceedings. The trial court also found that to the extent that an officer or officers had told Dr. Prahlow about an altercation, it had been the result of what the officers had already believed or known before 4:12 p.m. on March 14, 2014, namely, their belief that Taylor had shot Bush and their knowledge of the scratch marks on Taylor's body and that Taylor had appeared at MCPD with bloodstains on his clothing and hands.

[20] On February 26, 2018, Taylor was tried before a jury, after which a mistrial was declared when the jury could not reach a verdict. On June 18 through 20, 2018, Taylor was tried a second time before a jury. The Facebook messages from 5:00 a.m. on March 14, 2014, were admitted over Taylor's objection that they could not be attributed to him. Detective Cicero testified, over objection of

taint, regarding his analysis of bloodstains at the scene and on Taylor's clothing. Detective Cicero was not asked, and did not opine on, whether the bloodstains found on the scene or Taylor's clothing indicated that an alteration had occurred between Taylor and Bush before her death. Neither of Detective Cicero's written reports were offered into evidence.

[21] Dr. Prahlow testified, over objection, that "homicide" was the manner of Bush's death, meaning "death at the hands of another individual." Tr. Vol. IV p. 182. Dr. Prahlow testified that the gunshot was at contact range due to the presence of soot and stippling at the entrance wound, meaning that there was "either no space or little space" between her and the handgun when it fired. Tr. Vol. IV p. 200. While acknowledging that he could not exclude suicide as the manner of Bush's death, Dr. Prahlow testified that he had relied on information he had received and his own judgment to conclude that her death had, in fact, not been a suicide. Specifically, Dr. Prahlow emphasized that the location of the gunshot wound in the neck was quite unusual for a suicide, the "classic locations" being the chest, forehead, temple, mouth, or underneath the chin. Tr. Vol. IV p. 197. As for the possibility of an accidental shooting, Dr. Prahlow acknowledged on cross-examination that he could not exclude the possibility that the gun had been discharged while Taylor and Bush were wrestling over its possession. Dr. Prahlow's autopsy report, as admitted into evidence, did not include the circumstantial history that he had been told that Bush had reportedly been shot by her boyfriend.

During closing, Taylor argued that the evidence was consistent with Taylor and Bush arguing, Bush picking up a handgun, and an accidental discharge occurring during a struggle for the handgun, possibly due to a malfunction. The jury found Taylor guilty as charged. On July 31, 2018, the trial court sentenced Taylor to sixty years of incarceration.

# Discussion and Decision

## I. Admission of Evidence

Taylor contends that the trial court abused its discretion in allowing Detective Cicero and Dr. Prahlow to testify, admitting certain Facebook messages from Taylor's account, and allowing Dr. Prahlow to opine that Bush's manner of death was homicide. A trial court's ruling on the admission or exclusion of evidence is reviewed for an abuse of discretion that results in prejudicial error. *Williams v. State*, 43 N.E.3d 578, 581 (Ind. 2015). A trial court's evidentiary decision will be reversed for an abuse of discretion only where the court's decision is clearly against the logic and effect of the facts and circumstances, or when the court misinterprets the law. *Id.*

### A. Detective Cicero's and Dr. Prahlow's Testimony

Taylor contends that the testimony of Detective Cicero and Dr. Prahlow was tainted by the eavesdropping on his conversation with Payne and that the State failed to establish beyond a reasonable doubt that they had a source independent of the eavesdropping for their testimony. Here, it was for the trial court to determine whether the State's burden had been met. Generally, a trial court determines factual questions regarding admissibility by a preponderance

of the evidence, Ind. Evidence Rule 103(f), but the Indiana Supreme Court has determined, at least under the circumstances of this case, that the State's burden of proof was to be beyond a reasonable doubt. *See Taylor I*, 49 N.E.3d at 1029.

### 1. Detective Cicero

[25] Taylor contends that the State failed to establish beyond a reasonable doubt that Detective Cicero's testimony regarding bloodstain patterns had a source independent of the eavesdropping of Taylor's conversation with Payne. Taylor seems to argue that Detective Cicero's reports and testimony must have been affected by hearing that Taylor and Bush had been involved in some sort of altercation before her shooting, giving rise to a presumption of taint that the State failed to rebut. We disagree.

[26] At the first suppression hearing on June 16, 2014, Detective Cicero testified that he had not photographed Taylor's clothing as a result of any overheard conversation between Taylor and Payne, he had not been provided with any information that there may have been a struggle or altercation between Taylor and Bush, and his reports had not been prepared as a result of the conversation between Taylor and Payne. Detective Cicero also testified that his reports were prepared as part of a normal course of action when investigating a crime scene. Moreover, at the second suppression hearing on August 28, 2017, Detective Cicero testified that he had not overheard any of the conversation between Taylor and Payne on March 14, 2014, and had not heard anything about the conversation from anyone that had influenced his reports. It was within the trial court's discretion to credit Detective Cicero's testimony that his

investigation and conclusions were based on an independent source, and it did. Taylor's argument is, essentially, that Detective Cicero's analysis and testimony must have been tainted by whatever it is that he heard about the conversation between Taylor and Payne. This is nothing more than an invitation to reweigh the evidence, which we will not do.[1]

## 2. Dr. Prahlow

Taylor also contends that the State failed to establish that Dr. Prahlow's testimony had a source independent of the eavesdropping. Dr. Prahlow was not present in the war room at any time on March 14, 2014, so the *Taylor I* presumption of taint does not apply directly to him. Taylor, however, argues that Dr. Prahlow's conclusions are tainted because Detective Cooney's theory that a struggle occurred, which he relayed to Dr. Prahlow, was tainted. The record does reflect that Detective Cooney was in the war room after 4:12 p.m. on March 14, 2014, and did, in fact, later relate to Dr. Prahlow his theory that Taylor and Bush had struggled before she was shot. We conclude, however, that the State has produced evidence sufficient to establish that Detective Cooney's theory of a struggle was based on evidence independent of any eavesdropping that may have occurred.

---

[1] Taylor argues that Detective Cicero's conclusions were tainted without ever actually identifying those conclusions. As it happens, the only conclusion of consequence drawn in either report was that Taylor was standing near to Bush when she was shot, something that Taylor does not dispute. Neither of Detective Cicero's reports concluded that Taylor was the shooter (much less that he shot intentionally) or that a struggle preceded Bush's death. In any event, the reports were not offered into evidence at trial.

Even if we assume that Detective Cooney overhead some—or even all—of the conversation between Taylor and Payne from the war room, he testified at the second suppression hearing that he had already concluded before 4:12 p.m. that there had been a "scuffle or a fight or a confrontation […] from the totality of everything that we collected from the residence, and then the suspect himself coming to the station that had blood on his hands; the scratch marks, everything, lead me to believe -- my hypothesis was that some kind of conflict happened." Tr. Vol. III p. 76. As with Detective Cicero's testimony, the trial court was entitled to credit Detective Cooney's testimony that his theory that a struggle occurred was drawn from a source independent of Taylor and Payne's conversation, and it did. We again decline Taylor's invitation to reweigh the evidence.

### 3. Prosecutorial Misconduct

Taylor also argues that Detective Cicero's and Dr. Prahlow's testimony should have been excluded "because it was a fruit of prosecutorial misconduct." Appellant's Br. p. 26. As the *Taylor I* Court emphasized, a successful claim of prosecutorial misconduct consists of two components:

> First, there must be misconduct; and second, the misconduct must have placed the defendant in a position of grave peril. *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014). "The gravity of the peril is measured by *the probable persuasive effect* of the misconduct *on the jury's decision* rather than the degree of impropriety of the conduct." *Id.*

49 N.E.3d at 1029 (emphasis in *Taylor I*). Put another way, even the most egregious official misconduct does not entitle a defendant to relief unless it can be shown to have likely affected the jury's decision.

[30] While we certainly agree that the official misconduct here was "flagrant[,] unconscionabl[e, and] shameful[,]" *id*. at 1023–24, Taylor simply has not established that it ultimately had any probable persuasive effect on the jury's decision. As mentioned, all evidence regarding the Glock 22 handgun found in Michigan City was suppressed, and, as we have already determined, the State sufficiently overcame the presumption of taint with regard to the testimony of Detective Cicero and Dr. Prahlow. If the jury *did* conclude that a struggle occurred before Bush's death, it was not because it heard any witness testify that such a struggle occurred or saw any exhibit that contained such a conclusion because no such evidence was admitted. In fact, the jury may very well have concluded that a struggle occurred because Taylor himself urged it to by arguing that Bush was shot accidentally during a struggle. However egregious the official misconduct was in this case, Taylor has failed to establish that it placed him in any peril at all, much less grave peril.

## B. Facebook Messages

[31] Taylor contends that the trial court abused its discretion in admitting Facebook messages that he argues were insufficiently authenticated.

> "To lay a foundation for the admission of evidence, the proponent of the evidence must show that it has been authenticated." *Hape v. State*, 903 N.E.2d 977, 989 (Ind. Ct. App. 2009), *trans. denied*. Indiana Rule of Evidence 901(a) provides that "[t]o satisfy the

> requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Absolute proof of authenticity is not required. *M.T.V. v. State*, 66 N.E.3d 960, 963 (Ind. Ct. App. 2016), *trans. denied*. Rather, the proponent of the evidence must establish only a reasonable probability that the evidence is what it is claimed to be, and may use direct or circumstantial evidence to do so. *Pavlovich v. State*, 6 N.E.3d 969, 976 (Ind. Ct. App. 2014), *trans. denied*. Once this reasonable probability is shown, any inconclusiveness of the evidence's connection with the events at issue goes to evidential weight, not admissibility. *Fry v. State*, 885 N.E.2d 742, 748 (Ind. Ct. App. 2008), *trans. denied*.
>
> "Letters and words set down by electronic recording and other forms of data compilation are included within Rule 901(a)." *Wilson v. State*, 30 N.E.3d 1264, 1268 (Ind. Ct. App. 2015), *trans. denied*.

*Richardson v. State*, 79 N.E.3d 958, 962–63 (Ind. Ct. App. 2017) (paragraph numbers omitted), *trans. denied*. An adequate foundation may also be provided by circumstantial evidence "peculiar to the facts of the particular case" that "establish at least a prima facie showing of authentication." *Pavlovich*, 6 N.E.3d at 977 (quotation omitted). This foundation need not be based on evidence that is itself admissible. Evid. R. 101(d). Moreover, facts establishing a foundation do not have to be established solely by witnesses testifying at a trial as opposed to an earlier hearing. *Jeter v. State*, 888 N.E.2d 1257, 1267 (Ind. 2008); *McFall v. State*, 71 N.E.3d 383, 388–89 (Ind. Ct. App. 2017).

[32] The record contains ample evidence known to the trial court which authenticates Taylor's Facebook page and messages. First, the page in question was found by searching for Taylor's name on March 14, 2014, and the page

displays a photograph of Taylor. Moreover, Detective Barr found Taylor's Facebook identification and a link to his Facebook account on a computer in Bush's house. Accessing the Facebook page would have required the account owner's email address and password, and the trial court heard evidence that Taylor had used a computer in Bush's house the night before her death.

[33] Moreover, circumstances also tend to show that the messages in question were made by Taylor. "How you don't think you don't gotta please yo man … Goofy" was posted shortly before Bush was killed and indicates that the poster was displeased with how he was being treated by a paramour, and it is undisputed that Taylor and Bush were romantically involved. State's Ex. 7. Taylor's Facebook page also contains a message indicating that the poster had "fat heat[,]" which is a slang term for a firearm. State's Ex. 7. Because the evidence identifies Taylor as the owner of the Facebook account and the Facebook page contains messages whose content can be explained by the circumstances of Bush's death shortly after they were made, it is sufficient to support a finding of authenticity. *See Wilson v. State*, 30 N.E.3d 1264, 1269 (Ind. Ct. App. 2015) (concluding that testimony identifying a Twitter account as belonging to the defendant and evidence of content posted on the account corresponding to events developed in the investigation were "more than sufficient to authenticate the Twitter posts as being authored by Wilson"), *trans. denied.*

## C. Dr. Prahlow's Opinion Regarding Bush's Manner of Death

Taylor contends that the trial court abused its discretion in allowing Dr. Prahlow to testify regarding his conclusion that the manner of Bush's death was homicide, claiming that this was equivalent to opining that Taylor was guilty of murdering Bush. It is true that Indiana Evidence Rule 704(b) provides that "[w]itnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case[.]" Dr. Prahlow did not, however, opine that Taylor was guilty of murder, only that her death was a homicide; he merely offered testimony that supports an inference of guilt, which is unquestionably admissible. For one thing, Taylor's argument ignores Evidence Rule 704(a), which provides that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable just because it embraces an ultimate issue." While evidence that Bush's manner of death was homicide and that Taylor was the only other person in the room at the time may be damning, Dr. Prahlow simply did not testify that he believed Taylor to be guilty of murder. Essentially, Taylor would have us hold that evidence that allows an inference of guilt—all prejudicial evidence, in other words—is somehow equivalent to opinion testimony that a criminal defendant is guilty and therefore inadmissible in a criminal case. We will not consider adopting this clearly overbroad proposition. Taylor has failed to establish that the trial court abused its discretion in admitting Dr. Prahlow's testimony regarding Bush's manner of death.

# II. Sufficiency of Evidence

Taylor contends that the State produced insufficient evidence to support his murder conviction. When a defendant challenges the sufficiency of the evidence used to convict him of a crime, we consider only the probative evidence and reasonable inferences arising therefrom supporting the conviction. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We will affirm a conviction unless no reasonable factfinder could find the elements of the crime proven beyond a reasonable doubt. *Young v. State*, 973 N.E.2d 1225, 1226 (Ind. Ct. App. 2012). Put another way, reversal of a defendant's conviction "is appropriate only when a reasonable trier of fact would not be able to form inferences as to each material element of the offense." *Purvis v. State*, 87 N.E.3d 1119, 1124 (Ind. Ct. App. 2017), *aff'd on reh'g*, 96 N.E.3d 123 (Ind. Ct. App. 2018). This standard of review does not permit us to reweigh the evidence or allow us to judge the credibility of the witnesses. *McCallister v. State*, 91 N.E.3d 554, 558 (Ind. 2018). Where there is conflicting evidence in the record, we consider the evidence in the light most favorable to the judgment. *Drane*, 867 N.E.2d at 146.

Pursuant to Indiana Code section 35-42-1-1(1), the State was required in this case to establish that Taylor knowingly or intentionally killed Bush. It is not disputed that Taylor was in Bush's bedroom when she was killed by a single gunshot fired from contact range, and blood-splatter evidence establishes that Taylor was in close proximity to Bush at the time. There is also ample evidence that Taylor and Bush were involved in a confrontation that became physical

before she was shot. At 5:00 a.m. on March 14, 2014, Taylor posted a Facebook message indicating that he was upset with Bush for not pleasing him. Turner, who was in the room below Bush's bedroom, heard "wrestling" followed by a gunshot. Taylor's chest bore scratches when he was examined later in the day, and his DNA was found under Bush's fingernails.

[37]     The State also produced evidence of Taylor's flight and destruction and/or attempted concealment of evidence, which supports an inference of guilt. An eyewitness, physical evidence, and later recovery of the Glock 23 tend to show that, after Bush was shot, Taylor dressed, climbed out of her bedroom window, and quickly drove off, taking evidence with him. The State also produced some evidence that Taylor took Bush's mobile telephone with him when he left and later disposed of it together with his own. This evidence further supports an inference of guilt. *See*, *e.g.*, *Dill v. State*, 741 N.E.2d 1230, 1232 (Ind. 2001) ("Flight and related conduct may be considered by a jury in determining a defendant's guilt."); *Stone v. State*, 555 N.E.2d 475, 477 (Ind. 1990) (concluding that attempts to conceal evidence may be considered as proving consciousness of guilt).

[38]     As for the question of whether the handgun that killed Bush was fired deliberately , the State produced evidence that the Glock 23 handgun, which *could* have fired the fatal shot, functioned normally, requiring a deliberate pull of the trigger to fire in addition to the prior action of deliberately pulling the slide rearwards to chamber a round. This evidence tends to show deliberate action. *See, e.g.*, *Pierce v. State*, 705 N.E.2d 173, 175 (Ind. 1998) ("As for proof

that Pierce killed knowingly, an expert witness testified that the Lorcin pistol in question could only be fired by pulling the trigger; thus, other types of mishandling could not have caused the gun to discharge as Pierce claims.").

[39] The jury also heard evidence tending to show that Bush was not the person who fired the fatal shot. Dr. Prahlow, a board-certified forensic pathologist who had worked exclusively as a medical examiner and forensic pathologist for over twenty years, testified that a typical suicide involved a gunshot "to center chest, center forehead, temple, intraoral, or also underneath the chin[.]" Tr. Vol. IV. p. 197. Bush, however, was shot on the left side of her neck. In order for the right-handed Bush to shoot herself in the neck with her dominant hand, she would have had to have reached far underneath her chin and across her chest to angle the gun back to her neck. Taylor is also right-handed, though, and in order to put a gun to Bush's neck and pull the trigger, all that would have been required was a much more natural reaching motion with his dominant hand. In summary, the State produced evidence that Taylor was present when Bush died, he was in close proximity when she was shot, he fled and concealed evidence afterwards, the fatal gunshot was fired deliberately, and Bush was not the person who fired the handgun. We conclude that this is more than sufficient to sustain a finding that Taylor murdered Bush.

[40] Taylor relies on *Willis v. State*, 27 N.E.3d 1065, 1067 (Ind. 2015), for the proposition that his flight is not probative of his guilt. *Willis*, in which the defendant was convicted of criminal trespass solely on evidence that officers responding to a building saw him running in a field 100 yards away, is easily

distinguished. *Id.* The *Willis* Court concluded that the simple act of running through a field was not probative of whether Willis "interfered with the possession or use of the property of the Watkins Family Recreational Center." *Id.* Here, however, there is no dispute that Taylor was in the same room with Bush when she was shot, and the State produced evidence that he dressed himself, snuck out the window, and drove away from the house with such haste that he almost struck a wall. To the extent that *Willis* stands for the proposition that the mere act of running in the general vicinity of an alleged crime scene is insufficient to support a criminal conviction, it has no applicability to this case.

[41] Taylor also contends that the State failed to establish that he intended to kill Bush, relying on *Landress v. State*, 600 N.E.2d 938 (Ind. 1992). *Landress* is also easily distinguished. First, in *Landress* the State was required to prove that Landress intentionally killed the victim in order to impose the death penalty. *Id.* at 940. Here, however, the State was only required to prove that Taylor knowingly killed Bush, and "[a] person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." Ind. Code § 35-41-2-2(b); *see also* Ind. Code § 35-2-42-1-1(1) ("A person who [...] knowingly or intentionally kills another human being [...] commits murder, a felony.").

[42] *Landress* is also factually distinguishable. In that case, the evidence established only that (1) Landress participated in a robbery during which her accomplice fatally stabbed the victim multiple times and (2) of the two knives at the scene— one Landress brought to the robbery and one Landress took from the kitchen—

the victim's blood was found on the knife Landress took from the kitchen. *Id.* at 941–42. The *Landress* Court rejected the State's argument that because the victim had been stabbed with the knife Landress had taken from the kitchen, the jury could infer that Landress had stabbed the victim and that she had intended the victim to die. *Id.* at 942. In contrast, the evidence in this case does not establish that Taylor's connection to the fatal shot was simply giving the pistol to Bush in the midst of a physical altercation. As discussed above, the State produced evidence that the gun was fired by Taylor and not Bush. Taylor's reliance on *Landress* is unavailing. In the end, Taylor's claim is nothing more than an invitation to reweigh the evidence, which we will not do. *See Drane*, 867 N.E.2d at 146.

## III. Appropriateness of Sentence

[43] Taylor contends that his sixty-year sentence for murder is inappropriately harsh. We "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). "Although appellate review of sentences must give due consideration to the trial court's sentence because of the special expertise of the trial bench in making sentencing decisions, Appellate Rule 7(B) is an authorization to revise sentences when certain broad conditions are satisfied." *Shouse v. State*, 849 N.E.2d 650, 660 (Ind. Ct. App. 2006), *trans. denied* (citations and quotation marks omitted). "[W]hether we regard a sentence as appropriate at the end of the day turns on our sense of the

culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). In addition to the "due consideration" we are required to give to the trial court's sentencing decision, "we understand and recognize the unique perspective a trial court brings to its sentencing decisions." *Rutherford v. State*, 866 N.E.2d 867, 873 (Ind. Ct. App. 2007). Taylor has the burden to show his sentence is inappropriate in light of both the nature of the offense and his character. *Gil v. State*, 988 N.E.2d 1231, 1237 (Ind. Ct. App. 2013). This can only be done with "compelling evidence portraying in a positive light the nature of the offense […] and the defendant's character." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

[44] The nature of Taylor's offense contains nothing that puts it in "a positive light." *Id*. Taylor shot and killed his girlfriend when he was a guest in her home, apparently (at least in part) because she would not "please" him. State's Ex. 7. Taylor argues that the severity of this crime is lessened by evidence that Bush scratched the skin of his chest and arm before he killed her. If scratching Taylor was the act that got Bush killed, this, if anything, underscores the senselessness of Bush's killing. Instead of deescalating the situation and disengaging from the struggle, Taylor put a loaded handgun against Bush's neck and fired, killing her. Taylor did not summon help but, rather, dressed himself and fled, taking evidence with him. Taylor has failed to establish that the nature of his offense warrants a more lenient sentence.

[45]    As for Taylor's character, it is worth noting that while on pretrial release in this case, he picked up additional charges of attempted murder, criminal recklessness, and criminal recklessness by discharging a firearm into a building. That case was disposed of in the same court as this case, and the trial court observed that another person died as a result of Taylor's conduct in that case. Taylor had served the sentence for that other case by the time he was sentenced in this one, but the fact that he committed that act after killing Bush does not reflect well on his character, to say the least. Moreover, he murdered Bush when her family and Turner's children were asleep in their beds. As the trial court noted, this, at the very least, indicates that Taylor had no qualms about discharging a firearm when others in the home could have been struck by the bullet after it passed though the wall of the bedroom. Taylor has not established that his moderately-aggravated sixty-year sentence is inappropriate in light of the nature of his offense and his character.

# Conclusion

[46]    We conclude that the trial court did not abuse its discretion in allowing Detective Cicero and Dr. Prahlow to testify or in admitting evidence related to Taylor's messages on Facebook and Dr. Prahlow's testimony that the manner of Bush's death was homicide. Moreover, we conclude that the State produced sufficient evidence to sustain Taylor's murder conviction. Finally, we conclude that Taylor has failed to establish that his sixty-year sentence is inappropriately harsh.

[47]    We affirm the judgment of the trial court.

Baker, J., and Pyle, concur.